[No. S012644. Nov. 30, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
TEOFILO MEDINA, JR., Defendant and Appellant.

## COUNSEL

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Virginia C. Lindsay, Acting Chief Deputy State Public Defender, Victor J. Morse, Leslie Rose and Irene Kiebert, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Frederick R. Millar, Jr., William M. Wood and Holly D. Wilkens, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—Defendant Teofilo Medina, Jr., appeals from a judgment of the Riverside County Superior Court imposing the death penalty following

his conviction of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), robbery (§ 211), burglary (§ 459), and personal firearm use (§ 12022.5), accompanied by two special circumstance findings: robbery murder (§ 190.2, subd. (a)(17)(i)) and burglary murder (*id.*, subd. (a)(17)(vii)).

Prior to trial on the criminal charges, a hearing was held to determine defendant's competency to stand trial, and a jury determined that defendant was competent. A separate jury found defendant guilty as charged and ultimately returned a verdict of death. The trial court denied defendant's motion to modify the sentence (§ 190.4, subd. (e)), imposed the death penalty for the murder, and stayed execution of an aggregate 12-year sentence for the other offenses. Defendant's appeal is automatic. (§ 1239, subd. (b).) As will appear, we will affirm the judgment in its entirety.

## I. FACTS

In *People* v. *Medina* (1990) 51 Cal.3d 870 [274 Cal.Rptr. 849, 799 P.2d 1282] (hereafter *Medina I*), we affirmed a judgment of death entered by the Orange County Superior Court upon defendant's conviction of three counts of first degree murder. Our judgment was affirmed by the United States Supreme Court in *Medina* v. *California* (1992) 505 U.S. 437 [120 L.Ed.2d 353, 112 S.Ct. 2572]. In our *Medina I* decision, we observed that "[f]rom October 13 to November 7, 1984, defendant engaged in a crime spree, stealing a gun from a pawnshop, holding up two gas stations, a drive-in dairy, and a market, killing three employees of these establishments (Horacio Ariza, Douglas Metal, and Victor Rea), attempting to rob a fourth employee (Moon Yoon), and shooting at two citizens (Cynthia Police and Daniel Barrow) who attempted to follow his getaway car." (51 Cal.3d at p. 879.)

The present offenses occurred in Riverside County on or about October 18, 1984, during the course of the same crime spree described in *Medina I*, and involving yet another gas station burglary and robbery, and the murder of an attendant (Craig Martin). We briefly summarize the facts underlying these offenses.

On October 18, 1984, Craig Martin was working the night shift at an Arco gas station in Corona. At 1:10 a.m. on October 19, a customer found Martin's body lying on the floor and called police. A cash box was open and empty except for some pennies. Approximately $163 was missing. An autopsy confirmed that Martin had been shot, probably at close range. Shell fragments from a .22-caliber bullet were found nearby.

To link defendant to the Martin murder, the People introduced evidence of the uncharged murders of Ariza and Metal, referred to above. Ariza was killed on the evening of October 18, a few hours before victim Martin's body was discovered. Ariza, working at another Arco gas station, was shot in the head and shoulder, probably at close range. The cash drawer was empty; around $100 was missing. A witness saw a damaged green Maverick resembling defendant's car speed away from the station shortly before Ariza's body was discovered. The driver of the Maverick resembled defendant, who returned to his sister's home on the afternoon of October 19 carrying a sack filled with quarters, dimes, and nickels.

Victim Metal was shot and killed in the afternoon of November 4 at the drive-through dairy where he was employed. A "battered" green Maverick was seen parked and unoccupied, with its motor running, in front of the dairy shortly before Metal's body was discovered. He too had been shot at close range, suffering a "contact" gunshot wound to the head. The cash register was empty and $68 was missing. A partly empty Perrier bottle was found at the scene. A forensic expert testified with "100 percent" certainty that a fingerprint found on the bottle matched one of defendant's prints.

On October 23, defendant's sister, Sylvia Ayala, and others saw defendant with a large amount of cash (perhaps $300). The sister found a loaded handgun in defendant's shaving kit. She eventually placed the gun in the trunk of her car, where it was found after defendant's arrest. Defendant had stolen the gun from a pawn shop on October 13. Ballistics experts testified that although there were some "dissimilarities" in the marks made by defendant's gun, they nonetheless determined with "absolute certainty" that bullet fragments from the bodies of Martin, Ariza, and Metal were fired from this gun.

While being transported to the police station, an officer asked defendant about "the Corona murder." Defendant responded, "What do you want me to say?" After being told to tell the truth, defendant replied, "If I could only cry, but I can't cry. I couldn't even cry when my mother died."

Although defendant unsuccessfully attempted to relitigate the issue of his competence to stand trial (he had been found competent by a separate jury), he presented no other evidence at the guilt phase and, as previously stated, the jury found him guilty as charged.

At the penalty phase, the prosecution asked the jury to consider the guilt phase evidence and also presented evidence of defendant's murder of Victor Rea, evidence that had been excluded from the guilt phase. Rea had been

shot at close range on November 5, 1984, at a service station in Santa Ana where he was employed. Approximately $166 in cash had been taken, and bullet fragments matched those fired from defendant's gun. Additionally, the prosecution introduced evidence of numerous prior incidents of defendant's violent activity, including assaults on civilians, prison inmates and guards, a forcible sex offense, and several prior convictions in California and Arizona (namely, discharging a firearm into an inhabited building, burglary, assault with deadly weapon, rape, kidnapping, and lewd and lascivious acts).

The defense introduced mitigating evidence from defendant's other sister, Irene McIntosh, regarding his childhood and family background.

## II. COMPETENCY PHASE ISSUES

We first review the facts underlying defendant's competency phase contentions. In October 1987, a few months after the complaint was filed charging defendant with the present offenses, the court initiated proceedings to determine defendant's competency to stand trial. (See § 1368.) Court-appointed experts presented their reports, and a jury was selected to try the competency issue.

Dr. Kania, a defense expert, testified that defendant suffered from a psychotic disorder, probably schizophrenia, that he needed treatment, that he was not malingering, that he was unable to provide background about himself and could not understand the legal proceedings confronting him, and that he was incompetent to stand trial.

Dr. Oshrin, a prosecution expert, opined that although defendant was probably mentally ill to some degree, he was malingering, could understand the legal proceedings and could cooperate with counsel. Dr. Rath, another prosecution expert, concluded that defendant was competent, was malingering, and was merely unwilling, not unable, to cooperate with counsel. Dr. Sharma, a third prosecution expert, found defendant competent and probably malingering. All three prosecution experts believed that defendant "overdid" or unduly exaggerated his supposed mental illness during his interviews with them.

On March 16, 1988, the jury found defendant was competent to stand trial. Thereafter, on May 13, 1988, an information was filed charging the offenses previously named in the complaint and, on May 16, 1988, defendant pleaded not guilty to these charges.

On January 6, 1989, following disruptive conduct by defendant, the court again suspended proceedings and appointed experts to report regarding

defendant's competency. On June 19, a few months after these experts filed their reports, the court terminated competency proceedings and ordered that defendant proceed to trial restrained with waist chains and leg irons during the remaining court proceedings. Selection of a new jury commenced on July 5, and trial on guilt issues began on August 14, 1989.

## A. *Prosecutorial Misconduct During Competency Phase*

According to defendant, the prosecutor introduced "inflammatory and irrelevant" matters into the competency hearing, including (1) portraying defendant as a dangerous criminal by referring to his prior crimes and prior death sentence, (2) suggesting defendant could avoid punishment and possibly even escape from confinement if he were found incompetent, (3) informing the competency jury that another jury had found defendant sane and competent, and (4) improperly cross-examining the defense expert by referring to inadmissible studies and other materials. As will appear, no prejudicial misconduct occurred.

### 1. *Prior Offenses and Convictions*

■ Defendant complains that the prosecutor introduced information regarding defendant's prior offenses under the guise of questioning expert witnesses regarding the bases for their opinions. Thus, on cross-examination of Dr. Kania, the prosecutor asked if the witness was aware that defendant had been convicted of 25 felonies, including 3 counts of murder with special circumstances. Similarly, the prosecutor asked Dr. Oshrin whether he was aware of defendant's "numerous" felonies, and in his summation the prosecutor referred generally to "all the crimes [defendant] has committed."

Additionally, during voir dire examination of competency phase jurors, the prosecutor referred to defendant's previous death sentence, asking some prospective jurors whether they would be "disturbed" to learn such information. The prosecutor reinforced the point during his questioning of the various experts, and referred to it again in his summation by suggesting that defendant, being under "three separate sentences of death," had a motive to "fake a mental illness."

Defendant asserts that the prosecutor's foregoing disclosures during the competency phase constituted prejudicial misconduct tainting the jury's verdict by eliciting irrelevant and inflammatory information regarding defendant's prior crimes. Defendant urges the disclosures may have minimized the jury's sense of responsibility for its competency verdict, citing *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (*Caldwell*). *Caldwell*, however, involves sentencing considerations under the

Eighth Amendment to the United States Constitution, and neither it nor *Romano* v. *Oklahoma* (1994) __ U.S. __ [129 L.Ed.2d 1, 114 S.Ct. 2004], cited by the Attorney General, applies to competency proceedings, which (as we recently noted) are "civil in nature." (*People* v. *Stanley* (1995) 10 Cal.4th 764, 807 [42 Cal.Rptr.2d 543, 897 P.2d 481], citations omitted.)

The information regarding defendant's prior death sentence formed part of the basis of the experts' opinions on defendant's competency. It was, therefore, relevant and properly admitted. Additionally, defendant's trial counsel neither objected to any of the foregoing statements or disclosures by the prosecutor, nor sought an admonition to cure the harm. Defendant thereby waived his objections for appeal. (See, e.g., *People* v. *Montiel* (1993) 5 Cal.4th 877, 914 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People* v. *Proctor* (1992) 4 Cal.4th 499, 544 [15 Cal.Rptr.2d 340, 842 P.2d 1100], and cases cited; *Medina I, supra,* 51 Cal.3d at pp. 887, 895.)

Defendant contends that (1) the omission should be excused because the misconduct caused prejudice that could not be cured by an admonition to the jury, (2) the trial court had a sua sponte duty to "control" the prosecutor without awaiting an objection, and (3) counsel's failure to object constituted inadequate representation.

The first and last of defendant's points were rejected in *Medina I,* where we denied a similar claim of prosecutorial misconduct, stating: "We need not decide whether the prosecutor's remarks exceeded fair comment on the evidence elicited at trial, because defendant failed to object to the foregoing comments or seek an appropriate admonition, and must be deemed to have waived his objection. [Citations.] Although defendant suggests the misconduct was so pervasive and offensive that an admonition would have been useless [citation], a timely objection and admonition by the court at the outset might have tempered the prosecutor's aggressiveness *before* it became so extreme. That being so, it seems reasonable to place on defendant the burden of making a timely objection." (51 Cal.3d at p. 895.)

"We likewise reject defendant's assertion that counsel's failure to object may have reflected his incompetence. . . . [T]o obtain relief on incompetent counsel grounds, defendant must show a reasonable probability that his counsel's omission affected the verdict. (*Strickland* v. *Washington* [1984] 466 U.S. 668, 694 [80 L.Ed.2d 647, 697-698, 104 S.Ct. 2052].) We have no

sound basis for reaching such a conclusion here." (*Medina I, supra,* 51 Cal.3d at p. 895; see also *People* v. *Sheldon* (1989) 48 Cal.3d 935, 951 [258 Cal.Rptr. 242, 771 P.2d 1330] [failure to object to argument or evidence seldom establishes counsel's incompetence]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250] [same].)

What we said in *Medina I* applies with equal force in this case. Defense counsel's failure to object bars any claim of misconduct on appeal. Defendant cites no apposite authority supporting his view that his failure to object should be excused because it concerned supposed errors affecting "fundamental due process concerns," such as the determination of his competence to stand trial. In any event, as in *Medina I*, it is not reasonably probable that information regarding the defendant's prior crimes or convictions would have affected the jury's narrow decision as to his *competence* to stand trial.

As for the trial court's supposed sua sponte obligation to control the prosecutor's submission of evidence and argument (see § 1044), we have recently confirmed that "[t]he trial court . . . has no sua sponte duty to exclude evidence or to remedy misconduct." (*People* v. *Freeman* (1994) 8 Cal.4th 450, 490 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888]; accord, *People* v. *Montiel, supra,* 5 Cal.4th at p. 918.) As we stated in *People* v. *Visciotti* (1992) 2 Cal.4th 1, 79 [5 Cal.Rptr.2d 495, 825 P.2d 388], "[b]ecause we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations], defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry."

Even if we reached the merits of defendant's misconduct claim, we would find no basis for relief. We rejected a similar claim in *Medina I, supra,* where the prosecutor presented evidence and argument regarding defendant's prior crimes and convictions *during the competency phase* in that case. As we stated, "[w]e have reviewed the record and find no misconduct. The prosecutor simply outlined the competency hearing testimony and the facts on which that testimony was based, including occasional references to defendant's prior acts and convictions. Throughout his argument, the prosecutor explained to the jurors that his comments were not evidence, that the sole issue then before them was defendant's competence and not his guilt of any crimes, and that any evidence of such crimes was introduced for the sole purpose of determining the competency issue and not to show that defendant was 'a bad guy.' [¶] The trial court similarly instructed the jury that the prosecutor's comments were not evidence, and that any evidence introduced for a limited purpose, including the exhibits containing references to defendant's prior criminal record, should be considered only for that purpose." (*Medina I, supra,* 51 Cal. 3d at p. 888.)

Similar admonitions and instructions were given in the present case. We conclude that, as in *Medina I*, no prejudicial misconduct occurred here.

### 2. *Reference to Possible Escape*

■ Although the trial court, during the competency phase, sustained a defense objection to voir dire questions by the prosecutor regarding defendant's possible avoidance of criminal charges if he were found incompetent, the prosecutor, while cross-examining defense experts, included some questions emphasizing that any hospitalization for incompetence would be free of "custodial" conditions. At one point, the prosecutor observed that defendant previously had attempted to escape from a state hospital in Arizona.

Defendant contends that the prosecutor's statements constituted misconduct. (See, e.g., *People* v. *Babbitt* (1988) 45 Cal.3d 660, 704 [248 Cal.Rptr. 69, 755 P.2d 253] [improper to tell jury that if defendant is found insane, he will be set free]; cf. *Shannon* v. *United States* (1994) __ U.S. __, __-__ [129 L.Ed.2d 459, 466-467, 114 S.Ct. 2419] [dictum].) But defendant failed to object to the foregoing remarks and, accordingly, the point was waived for appeal. (*Medina I, supra*, 51 Cal.3d at pp. 895-896.) In any event, we have reviewed the record and the remarks at issue were not so aggravated as to constitute prejudicial misconduct. Neither the prosecutor's cross-examination nor his arguments strongly expressed or implied that a finding of defendant's incompetence would pose a risk of possible escape.

### 3. *Reference to Previous Finding of Competency*

The prosecutor, during questioning of Dr. Rath, referred to the fact that defendant had been found competent to stand trial in Orange County. Defendant's Orange County trial occurred almost two years prior to trial in the present case. As defendant observes, a prior finding of competence "does not prove competence at a significantly later time." (*People* v. *Samuel* (1981) 29 Cal.3d 489, 497, fn. 4 [174 Cal.Rptr. 684, 629 P.2d 485].)

Defendant, however, made no objection to the prosecutor's remark and, accordingly, he waived the point for appeal. (*Medina I, supra*, 51 Cal.3d at pp. 895-896.) Moreover, it is not likely the jury's competency verdict was affected by the disclosure that defendant had been adjudged competent some 20 months earlier.

### 4. *Cross-examination Regarding Inadmissible Studies*

During his cross-examination of Dr. Kania, the prosecutor attempted to challenge the witness's diagnosis of schizophrenia and incompetence by

asking whether he was aware of "the study done by Drs. Taylor, Gastanok, and Abrams" involving frequent mistaken diagnoses of schizophrenia. Dr. Kania was unaware of this study. The prosecutor described various similar studies, including one with which Dr. Kania was familiar. Defendant now contends the prosecutor committed misconduct by, in effect, "testifying" regarding the content and results of these studies, none of which had been admitted into evidence or relied on by Dr. Kania in preparing his diagnosis. (See *People* v. *Visciotti*, *supra*, 2 Cal.4th at p. 81 [involving a substantially similar claim].) But defendant failed to object to the prosecutor's conduct. As we noted in *Visciotti*, "[c]learly, an admonition to the prosecutor and to the jury would have cured any prejudice from the improper conduct." (*Ibid.*, fn. omitted.)

Defendant also complains that the prosecutor's cross-examination questions included references to the ability of certain actors (e.g., Jack Nicholson in the movie ONE FLEW OVER THE CUCKOO'S NEST (United Artists 1975)) to depict realistically the symptoms of schizophrenia. Again, no objection was made, no admonition sought. On the merits, the questions seem legitimate, being aimed at showing in a manner readily understood by lay jurors, that mental illness can be feigned. Moreover, even assuming misconduct occurred, it is not reasonably probable the competency jury was influenced by the prosecution's references to screen depictions of schizophrenia.

### B. *Lay Testimony of Prosecution Experts*

■ Defendant contends that two prosecution experts expressed improper lay opinions regarding his character. At one point in his testimony, Dr. Rath, a clinical psychologist, offered his view that defendant was "street wise." Defendant suggests that the jury may have relied on such characterization in concluding that defendant was feigning mental illness. Similarly, Dr. Sharma offered the observation that defendant had a "much shorter fuse than the average person." Defendant speculates that the jury may have relied on this testimony in deciding that he should stand trial rather than be hospitalized. No objection was made to either comment.

Although defendant claims the foregoing observations constituted improper lay opinion (see Evid. Code, § 801, subd. (b)) which impugned defendant's character (see *id.*, § 1101, subd. (a)), defendant's failure to object bars the claim. (See *Medina I, supra*, 51 Cal.3d at pp. 895-896.) On the merits, the testimony seems unobjectionable. Certainly, experts are entitled to express or explain their opinions in an informal manner easily understood by the jury. Moreover, it is not reasonably probable the descriptions of defendant as "street wise" and "short-fused" unduly influenced the jury in its competency decision.

## C. *Shackling Defendant*

 Defendant contends the court improperly ordered him shackled during the competency phase of trial. The record shows that defendant was shackled when he arrived in court prior to the commencement of voir dire. The prosecutor recommended to the court that defendant remain shackled. He explained that defendant had been shackled during his entire trial in Orange County (See *Medina I, supra,* 51 Cal.3d at pp. 897-898), following "several outbursts" by defendant, "including him picking up a counsel table and throwing it across the room where it landed at the base of the judge's bench," nearly striking a court reporter. Additionally, according to the prosecutor, defendant had both attempted and accomplished a number of escapes, and had "acted out in a violent fashion" while confined, "destroying" several jail and prison cells. The prosecutor also noted that defendant had been convicted of 25 felony counts, including 3 murders.

Defense counsel objected to the shackling of his client, but he neither objected to, nor contested, any of the prosecutor's foregoing factual assertions. Counsel merely stressed that, during the past eight months, defendant had made several court appearances in Riverside County without incident, and had caused no problems in jail except for attempting to kill himself by cutting his own throat.

The court ruled that, based on the nature of the past and current charges, and on defendant's past violent and disruptive conduct, he should remain shackled. Defendant now contends the court abused its discretion by ordering the shackling (1) "without adequate evidentiary support," and (2) without considering "less drastic and less intrusive means" of maintaining courtroom security.

In *Medina I, supra,* 51 Cal.3d at p. 897, we reiterated the general rules governing claims of improper shackling: "[T]he applicable authorities have characterized shackling as a 'last resort' to be used where a manifest need therefor arises and no lesser measures would suffice. (See *Illinois* v. *Allen* (1970) 397 U.S. 337, 343-344 [25 L.Ed.2d 353, 358-359, 90 S.Ct. 1057]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1261-1265 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Duran* (1976) 16 Cal.3d 282, 290 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) [¶] . . . [R]ecent cases of this court have upheld shackling in similar situations involving defendants who have a prior record of violence or who have displayed violent behavior in the courtroom. (E.g., *People* v. *Sheldon*[, *supra,*] 48 Cal.3d 935, 945-946 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Hamilton* (1985) 41 Cal.3d 408, 423-424 [221 Cal.Rptr. 902, 710 P.2d 981].)"

The decision to shackle a defendant "cannot be successfully challenged on review except on a showing of a manifest abuse of discretion." (*People* v. *Duran* (1976) 16 Cal.3d 282, 293, fn. 12 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) No abuse of discretion is apparent here.

Defendant's suggestion that there was inadequate evidentiary support for shackling him is frivolous in light of the prosecutor's uncontested statement cataloguing defendant's prior violent conduct in and out of the courtroom. The court was not obliged to hold a formal evidentiary hearing on the matter, but could base its determination on factual information properly brought to its attention. (Cf. *People* v. *Cox* (1991) 53 Cal.3d 618, 652 [280 Cal.Rptr. 692, 809 P.2d 351] [error to base shackling order on "rumor and innuendo," including defense counsel's vague reference to a possible escape attempt].) The prosecutor was an officer of the court whose representations of fact, made without objection or rebuttal by defendant, properly could sustain the court's ruling. (See *People* v. *Clark* (1992) 3 Cal.4th 41, 146 [10 Cal.Rptr.2d 554, 833 P.2d 561]; 27 Cal.Jur.3d, Pt. 2 (rev.) District and Municipal Attorneys, § 12, at p. 447, and cases cited.)

Defendant also contends the court erred in failing to explore less intrusive alternatives to shackling, such as the use of "strategically placed guards." But the prosecutor's recital of defendant's unshackled outburst in an Orange County courtroom, previously described, strongly supports the trial court's discretionary decision to shackle defendant in the present proceedings. (We note that subsequent events indicate the court's ruling was sound. On June 19, 1989, shortly before trial commenced, defendant, while shackled and surrounded by four deputies, nonetheless managed to turn over the counsel table.)

Defendant next contends that the court erred in failing to (1) assure that his shackles would not be visible to the jury, and (2) instruct the jury sua sponte that it should not consider defendant's restraints or his prison clothing in deciding the issue of his competence. Although the record is silent on the question, defendant assumes from the nature of the restraints used to confine him that they were at least partly visible to the jury.

█ As a general rule, shackles and other restraints should be "as unobtrusive as possible." (*People* v. *Duran, supra,* 16 Cal.3d at p. 291.) On the other hand, unless the guilt question is close, allowing the guilt phase jury to briefly view a shackled defendant is ordinarily deemed nonprejudicial error. (See *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 583-584 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *People* v. *Sheldon, supra,* 48 Cal.3d at p. 946; *People* v. *Duran, supra,* 16 Cal.3d at pp. 287, fn. 2, 295-296.)

Similarly, if the defendant's restraints have been viewed by the jury, the court ordinarily should instruct the jury not to consider the fact that restraints have been employed in determining defendant's guilt. (*People* v. *Duran*, *supra*, 16 Cal.3d at pp. 291-292.) But no sua sponte instruction is required if the restraints are not visible by the jury. (*People* v. *Livaditis* (1992) 2 Cal.4th 759, 775 [9 Cal.Rptr.2d 72, 831 P.2d 297].) Moreover, failure to give such an instruction sua sponte may be deemed harmless if the omission is unaccompanied by other substantial errors and the guilt issue is not closely contested. (*Medina I*, *supra*, 51 Cal.3d at p. 898.)

 Here, the jury was not concerned with the issue of guilt, but with defendant's competence to stand trial. Defendant's suggestion that the jury, having probably viewed his restraints, may have been induced to find him competent seems illogical and unduly speculative. We cannot assume from a silent record that the jury viewed defendant's restraints. Moreover, even assuming otherwise, we doubt the jury's factual finding of defendant's competence to stand trial was influenced by viewing those restraints. Accordingly, we conclude that defendant was not prejudiced by either permitting the jury to view defendant's restraints or failing to give a cautionary instruction.

As for admonishing the jury to ignore defendant's prison clothing in deciding the competence issue, the record discloses that defendant voluntarily declined the court's offer to appear in civilian clothes. Under these circumstances, defendant may have had a tactical reason for wearing prison attire, and the court cannot be faulted for failing to raise the matter sua sponte.

### D. Use of Antipsychotic Medication

Defendant observes that he was given antipsychotic medicine (Thorazine) during the competency phase of trial, at a time when various experts were examining him. Immediately following the jury's finding of competence, the medicine was discontinued, partly because he was refusing to take it. Jail records indicate that an antipsychotic medicine other than Thorazine was thereafter given to defendant. These records recite that defendant became "more agitated" once he stopped taking Thorazine, exhibiting a "psychotic obsession" with certain consent forms given to him for signature, and appearing "paranoid and suspicious."

Following the competency trial, and several months before the guilt phase commenced, defense counsel, without mentioning the Thorazine issue, informed the court that his client was not communicating with him. The court

ordered further competence reports and, as related in part II.E.1. (see *post*, this page ), Drs. Kania and Rath found that defendant remained competent to stand trial.

■ Defendant now asserts that his competence was initially determined while he was under the "influence" of Thorazine, and that "nothing in the record" indicates the Thorazine treatment was resumed during the guilt or penalty phases of trial. Defendant finds it "unlikely" that the new medicine rendered him competent to stand trial. He suggests that these circumstances "undermine the reliability" of the jury's competency, guilt, and penalty verdicts in this case.

As stated in a recent case involving a similar situation, "a defendant is mentally incompetent 'if, *as a result of mental disorder or developmental disability*, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' (§ 1367, italics added.) . . . [N]o substantial evidence was raised indicating he was unable to understand the nature of the proceedings or to cooperate with his counsel. . . . In light of the entire record, we conclude the court was not required to order a formal competency hearing." (*People* v. *Danielson* (1992) 3 Cal.4th 691, 727 [13 Cal.Rptr.2d 1, 838 P.2d 729].)

Similarly, in the present case, the record fails to support defendant's assertion that he became incompetent to stand trial after his Thorazine medication ceased. Defendant's assertions to the contrary are based solely on unsupported speculation. Nothing in the record establishes that the Thorazine or other medication taken by defendant concealed his incompetence from the experts or the jury, or rendered him unable to understand the proceedings or cooperate with his counsel.

E. *Failure to Hold Second Competency Hearing*

1. *Defendant's Inability to Communicate With Counsel*

■ Defendant contends the court erred in failing to hold a second competency hearing after defense counsel had advised the court, several months before the guilt phase commenced, that his client was not communicating with him. The record indicates that, 10 months after a jury found defendant competent, his counsel informed the court that defendant refused to talk to him or even acknowledge his presence. The court appointed two experts, Drs. Kania and Rath, to examine defendant, and set a date for another competency hearing.

The experts later reported, respectively, that "no new information" had been obtained (Dr. Rath) and that "no opinion can be offered regarding his

present competency" (Dr. Kania). Subsequently, defense counsel informed the court that defendant had "no evidence" to present at the hearing, because defendant had refused to talk to "the psychiatrist" appointed to examine him. The court concluded that, under such circumstances, no point would be served in holding a formal hearing, as no change in circumstances had been shown since the date of the last competency hearing.

Defendant now argues the court erred in not holding a second competency hearing, based on the "substantial new evidence" of defendant's failure to communicate with his counsel or cooperate with the court appointed experts. The argument lacks merit.

Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence. (See *People* v. *Kelly* (1992) 1 Cal.4th 495, 542-543 [3 Cal.Rptr.2d 677, 822 P.2d 385] [no change in circumstance to justify second hearing]; *People* v. *Jones* (1991) 53 Cal.3d 1115, 1153-1154 [282 Cal.Rptr. 465, 811 P.2d 757] [general assertion of defendant's worsening condition and inability to cooperate with counsel inadequate to justify second hearing].)

Here, counsel conceded there was no new evidence to introduce at a second hearing, a concession on which the court could properly rely. Moreover, the record indicates that prior to the *initial* finding of his competence, defendant had exhibited an unwillingness to cooperate with his counsel and examining psychiatrists, albeit by affirmative efforts to appear psychotic rather than the mutism and withdrawal he displayed during the subsequent occasions when his competency was again questioned. His continued non-cooperation did not, under the circumstances, constitute substantial evidence of a change in circumstances necessitating a new hearing.

Defendant contends that once the court initially decided to hold a second competency hearing, that decision was irrevocable, as it reflected the court's "doubt" regarding defendant's competence, a doubt that automatically triggered a formal hearing. (See, e.g., *People* v. *Price* (1991) 1 Cal.4th 324, 396-397 [3 Cal.Rptr.2d 106, 821 P.2d 610].) Yet defendant cites no authorities suggesting the trial court lacked authority to reconsider its decision once defense counsel announced that the defense would offer no further evidence of defendant's incompetence. (See *People* v. *Danielson, supra,* 3 Cal.4th at pp. 726-728 [court's preliminary expression of concern about competence does not require formal hearing]; *People* v. *Price, supra,* 1 Cal.4th at pp. 396-397 [same].) In light of the fact that defendant had the

burden of demonstrating his incompetence (see *Medina* v. *California, supra,* 505 U.S. 437 [120 L.Ed.2d 353]), the court properly could conclude that holding another competency hearing would be pointless.

In a related argument, defendant contends his counsel was incompetent in failing to argue that his client's failure to cooperate constituted substantial new evidence of his incompetence. The record, however, indicates that counsel acted reasonably, informing the court of his client's unwillingness or inability to cooperate and announcing that the defense had no further evidence to present on the matter. Defense counsel did not concede that a hearing was unnecessary, and instead assumed that it would be held as originally scheduled.

### 2. *Defendant's Disruptive Conduct*

■ As set forth in part III.A. (*post,* at this page), defendant was removed from the courtroom during much of the voir dire and trial proceedings because of his continued cursing and other disruptive conduct. Defendant suggests that such conduct should have raised a "doubt" sufficient to justify a renewed competency hearing. We disagree. We have recently confirmed that more is required to raise a doubt of competence than the defendant's mere bizarre actions or statements, with little reference to his ability to assist in his own defense. (See *People* v. *Danielson, supra,* 3 Cal.4th at p. 727.) Defendant's cursing and disruptive actions displayed an unwillingness to assist in his defense, but did not necessarily bear on his *competence* to do so, or reflect a substantial change of circumstances or new evidence casting serious doubt on the validity of the prior finding of the defendant's competence. (See *People* v. *Kelly, supra,* 1 Cal.4th at pp. 542-543.)

### III. GUILT PHASE ISSUES

### A. *Defendant's Absence From Trial Proceedings*

By reason of his repeated disruptive conduct, defendant was absent from the courtroom during much of his trial, including jury voir dire, evidence and argument presentation, counsel's arguments, and the reading of instructions to the jury. Defendant now contends that he had no right to waive his right to be present during trial, that his outbursts were insufficient to justify his exclusion from trial, and that the court failed adequately to inform him regarding the various rights that he would be surrendering by reason of his absence. We find no merit to these arguments.

We briefly outline the various instances of disruptive conduct the court deemed sufficient to warrant defendant's exclusion. For convenience, we include discussion of the issue as it affects both the guilt and penalty phases.

1. *Pretrial and Jury Selection Events*

On June 19, 1989, prior to trial, defendant, while shackled, overturned the counsel table and was removed from the courtroom. On July 6, outside the presence of the prospective jurors, defendant again lifted and threw the counsel's table, complaining about the tightness of the chains confining him. Defendant was again removed.

On July 10, after defendant cursed and complained about his restraints, the court warned him that he would be removed from the courtroom and would be tried in absentia if he persisted in causing disturbances. Later that day, defendant called the judge and a prospective juror "pigs," and soon thereafter cursed them repeatedly in exceptionally coarse terms. Following the foregoing outburst, the court ordered defendant removed from the courtroom for the rest of the week, but directed that jail personnel be asked to contact defendant *daily* to determine whether he was willing to "behave." On the next day, July 11, the bailiff reported that defendant responded negatively to such an inquiry, stating that "I ain't going to promise anything. I might get worse." On July 12, the bailiff reported that defendant responded to a renewed inquiry with more obscene language. On July 13, defendant shook his head negatively when asked if he wanted to come to court. On July 17, defendant again responded negatively.

The court ordered defendant brought to court on July 18, 1989. On inquiry, defendant confirmed that he did not want to be there, nor did he wish to watch his trial through closed-circuit television. Defendant thereupon complained about his restraints and began rocking his chair back and forth. The court again ordered defendant removed. When the bailiff approached, defendant cursed and threw his knees up against the top of the counsel table. Eventually, three deputies were able to restrain and remove him. Jury selection continued in his absence.

On July 20, the bailiff reported that defendant did not want to come to court. On July 24, defendant was brought to court, but on seeing a video camera in the courtroom, he began cursing. When the court asked defendant if he desired to remain, he replied negatively. Defendant was removed once again.

The bailiff confirmed to the court that defendant declined to come to court during the remainder of the week. On July 31, defendant was brought back, but he shook his head when asked if he wished to remain during jury selection and he was removed again. The bailiff reported that defendant declined to return to court on August 1, 2, and 3.

When brought to court on August 8, defendant again shook his head when asked if he wished to remain in court. Before removing him, the court informed defendant that trial would commence on the following Monday, and that it was important that defendant be present to assist his counsel in questioning witnesses.

### 2. Guilt Phase

On August 11, 1989, the bailiff reported that defendant still declined to attend trial. On August 14, the first day of evidentiary presentation, defendant was brought to the courtroom. He complained about the courtroom cameras and his assertedly tight restraints. The court asked the camera crew to leave and requested the transport officer to loosen defendant's hand restraints.

Defendant seemed calm during discussions regarding exhibits, but once the jury entered the courtroom, defendant began to curse and rage. Defendant remained quiet during the trial court's introductory remarks to the jury, and the beginning of the prosecutor's opening statement. But he soon exploded with more cursing and invective while the prosecutor attempted to complete his statement. The court directed the jurors to leave the courtroom and asked defendant if he wanted to return to his jail cell. He nodded his head affirmatively. The court allowed the prosecutor's first witness, Orlijan, to view defendant before removing him, so that the witness could identify defendant for purposes of his testimony. The court then ordered defendant removed, stating that "we will not see him again."

Thereafter, defendant was absent from the remainder of his trial. Jail personnel, however, continued regularly to contact defendant and ask him whether he wished to appear or to watch the trial on closed-circuit television. On each such occasion, defendant gave negative responses.

### 3. Penalty Phase

Defendant was absent during the entire penalty phase. Again, jail personnel reported to the court's bailiff that they continued on a daily basis to determine that defendant neither wished to attend his trial nor to watch the proceedings on television. Defendant was present, and nondisruptive, when the penalty verdict was read, and later when the court heard and denied the automatic motion to modify the verdict.

### 4. Discussion

As defendant indicates, he was removed from the courtroom five times during jury selection (July 10, 18, 24, 31 and August 8), and once at

the beginning of the guilt phase (August 14). He was not present in court between the dates of these removals, and he was not returned to the courtroom until the reading of the penalty verdict (September 27). According to defendant, the court erred, and denied him due process of law, by allowing him to waive his right to be present at trial, and by failing to continually warn him that his conduct would result in removal from the courtroom.

Defendant concedes that he was properly removed for disruptive behavior on July 10. But defendant contends that on August 14 he was removed without proper warning, that on July 31 and August 8 he was removed after merely failing to respond to the court's inquiry, and that on July 18 and 24 he was removed after merely indicating a desire to leave. Defendant contends that his exclusions from the courtroom were not authorized by the statutory provisions governing a defendant's presence at trial. (See §§ 977, subd. (b), 1043.)

As we have recently stated, "[a] disruptive defendant waives his right to be present at trial. (*Illinois* v. *Allen* (1970) 397 U.S. 337 . . . .)" (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1239 [283 Cal.Rptr. 144, 812 P.2d 163]; see also *People* v. *Price, supra,* 1 Cal.4th at pp. 404-406; *People* v. *Robertson* (1989) 48 Cal.3d 18, 59-62 [255 Cal.Rptr. 631, 767 P.2d 1109].) Although defendant asks us to reconsider our holding as to waiver, we see no compelling reason for doing so. None of the federal authorities cited by defendant would preclude a waiver resulting from continued disruptive conduct. Our review of the record discloses a continuous pattern of hostile and disruptive conduct fully justifying the court's decision to remove defendant from the courtroom, and to exclude him therefrom until he evinced a willingness to participate in a nondisruptive manner.

Defendant focuses on statutory language assertedly requiring a capital defendant's presence at his trial despite his voluntary absence. (See § 977 [requiring defendant's presence during evidence presentation]; § 1043, subd. (b)(2) [limited exception to trial presence requirement for *noncapital* case defendants who are "voluntarily absent"].) Section 1043, however, alternatively provides that an *unduly disruptive* defendant, after being warned, may be removed from the courtroom until he "reclaims" his right to be present by expressing his willingness to conduct himself properly. (See *id.,* subds. (b)(1) & (c).) This provision fully justified the court's exclusion orders in this case. (See *People* v. *Price, supra,* 1 Cal.4th at pp. 405-406; *People* v. *Sully, supra,* 53 Cal.3d at pp. 1239-1241.) Being tried on capital charges does not confer the right to disrupt court proceedings.

Defendant argues, however, that the court erred in failing to give new warnings to him prior to each subsequent removal, and in failing adequately

to advise him of his right to return to the courtroom. Under the circumstances of this case, outlined above, the failure to give renewed warnings or advice was unnecessary. The court repeatedly made it clear to defendant that he would continue to be removed if his disruptive conduct persisted, and that he could return to the courtroom once he agreed to behave properly.

Defendant complains that the court "relied on third hand information to conclude that appellant was waiving his presence voluntarily or that he would be disruptive. This was clearly not a constitutionally adequate waiver . . . and was not an adequate offer to [allow defendant to] return to the trial." In defendant's view, the court should have repeatedly brought defendant to court despite his assertions to jail personnel or to the court bailiff that he would not agree to behave. We disagree. The court properly relied on jail personnel to relay the pertinent information to the court bailiff. No objection was made to this procedure and, in any event, we find it unobjectionable. Busy trial courts need not engage in idle acts. (See *People* v. *Sully, supra*, 53 Cal.3d at p. 1240 ["Defendant was given the opportunity mandated by the statute to correct his errant behavior; he declined it. No more was required to justify his voluntary absence. Section 1043, like other provisions of law, does not require idle acts."].)

Defendant contends that he should have been returned to court after the jury rendered its guilty verdict, and before the penalty phase commenced. He relies on language in section 1043 to the effect that a disruptive defendant may be tried in absentia "to and including the return of the verdict." We doubt the Legislature had in mind the bifurcated phases of a unitary capital trial (see *People* v. *Superior Court (Mitchell)* 5 Cal.4th 1229, 1233 [23 Cal.Rptr.2d 403, 859 P.2d 102]) when it adopted the foregoing language. It is more likely that this language was intended to assure the defendant in a criminal case would be present in the courtroom at the time of sentencing, following trial.

Defendant suggests that the court "at least" could have temporarily continued the trial until defendant "calmed down" enough to participate. First, no such request was made. Second, it is apparent from the record that, even after defendant had ample opportunity to "calm down," he continued to misbehave, and gave no sign of changing his behavior. The court did not err in failing to continue the trial sua sponte.

Defendant contends the court erred in failing to instruct the jury, sua sponte, that it should ignore his outburst and his subsequent absence from trial. Defendant acknowledges that, during voir dire, the court admonished each juror individually not to draw adverse inferences from his absence. But,

according to defendant, these pretrial admonishments were an insufficient substitute for a formal jury instruction following trial. We disagree.

In the absence of a request therefor, the court has no obligation to instruct the jury regarding a defendant's absence from trial. (*People* v. *Sully, supra,* 53 Cal.3d at p. 1241.) Nor did defense counsel's failure to request such an instruction necessarily constitute inadequate representation. Counsel, aware that the jurors already had been given an admonishment on the subject during voir dire, reasonably could have concluded that an additional admonishment, coming at the close of trial, could do more harm than good by calling the jury's attention to defendant's absence, and to the disruptive conduct that necessitated it.

As we recently stated in a similar situation, "[w]e also reject defendant's related contention that counsel's failure to request a limiting instruction on the prior offenses reflected his incompetence. As previously indicated, counsel may have deemed it tactically unwise to call further attention to defendant's prior offenses by requesting special instructions. [Citations]." (*People* v. *Johnson* (1993) 6 Cal.4th 1, 50 [23 Cal.Rptr.2d 593, 859 P.2d 673]; see *People* v. *Lewis* (1983) 144 Cal.App.3d 267, 281 [192 Cal.Rptr. 257].)

### B. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during voir dire questioning of some of the prospective jurors who actually sat on his jury (hereafter called ultimate jurors). Defendant states that although he made "some" objections to the prosecutor's comments, "some" of these remarks went unchallenged. ▉▉▉ It is well established that a defendant cannot complain on appeal of misconduct by the prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. (*People* v. *Fierro* (1991) 1 Cal.4th 173, 207 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) This rule applies to asserted prosecutorial misconduct committed during voir dire. (*Ibid.;* see also *People* v. *Ghent, supra,* 43 Cal.3d at p. 770.)

In general, defendant complains that the prosecutor "improperly used voir dire to misinform the jurors and predispose them in favor of a death sentence." The prosecutor assertedly mischaracterized the nature of the penalty phase process and the purpose for which the mitigating and aggravating evidence would be admitted. Additionally, the prosecutor assertedly urged during voir dire that a death sentence was needed to control defendant's violence and deter others from committing such crimes, and told some

ultimate jurors not to consider any "lingering doubt" as to defendant's guilt. Finally, according to defendant, the prosecutor diminished the jury's sense of responsibility by telling some ultimate jurors that the death penalty law was unique because it permitted a death sentence only for certain murders, and no executions had occurred in California for 24 years. As will appear, defendant waived his right to complain of these matters by failing to object to them below. Further, in our view, none of these instances involved prejudicial misconduct.

### 1. Statements Regarding Nature of Mitigating and Aggravating Evidence and Weighing Process

The prosecutor indicated to several ultimate jurors that mitigating evidence was the kind of evidence showing the "positive factors" in defendant's life, such as being a war hero or Boy Scout leader, whereas aggravating evidence would involve "negative evidence" such as a prior criminal conviction. The prosecutor further indicated that the jury's task in deciding the appropriate penalty was to weigh these positive and negative aspects. Defendant's only objection to such statements during voir dire was that the prosecutor's examples of mitigating evidence involved situations that were not present in the case.

Defendant now contends the prosecutor's voir dire statements were incomplete and inaccurate, but as he did not object to the statements on this ground, the present objection was waived. (See *People* v. *Cooper* (1991) 53 Cal.3d 771, 843 [281 Cal.Rptr. 90, 809 P.2d 865].) In any event, we find no prejudicial misconduct here. The prosecutor's statements, though somewhat simplistic, were not legally erroneous, and defendant had ample opportunity to correct, clarify, or amplify the prosecutor's remarks through his own voir dire questions and comments.

Moreover, as a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case. Any such errors or misconduct "prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings, before its attention has even begun to focus upon the penalty issue confronting it." (*People* v. *Ghent, supra,* 43 Cal.3d at p. 770.) This analysis is likewise applicable to each of the other instances of asserted misconduct, discussed below.

### 2. Statements Regarding Reason for Executing Defendant

During voir dire, the prosecutor indicated or implied to some ultimate jurors through his questioning that one purpose served by the death

penalty might be to protect prison guards, doctors, and other personnel who might otherwise have to deal with dangerous convicts in prison. Defendant failed to object, and the point was thereby waived for this appeal.

In any event, the prosecutor committed no misconduct. A similar situation arose in *People* v. *Danielson, supra,* 3 Cal.4th 691. There, during his penalty phase arguments, and over the defendant's objection, the prosecutor rhetorically asked the jury, " 'How many of you would like your son or husband being a guard wherever this man may be? How many of you would like your husband or son being a transportation officer handling him and you think you would feel safe?' " (*Id.* at pp. 720-721.) We rejected the contention that such argument was improper, observing that several prior cases had upheld the prosecutor's right to raise in jury arguments the subject of the defendant's future dangerousness.

We concluded in *Danielson* that the prosecutor's penalty phase argument "fell within the range of argument permitted" by the applicable cases. (*People* v. *Danielson, supra,* 3 Cal.4th at p. 721.) A fortiori, we reach the same conclusion here with respect to the prosecutor's preliminary voir dire statements.

### 3. *Statements Regarding the Value of the Death Penalty as a Deterrent*

The prosecutor asked some ultimate jurors whether they believed the death penalty was a deterrent to others. Defendant did not object to the inquiries and, accordingly, the point was waived for appeal. (See *People* v. *Wrest* (1992) 3 Cal.4th 1088, 1105 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) In any event, no prejudicial misconduct occurred. The prosecutor did not affirmatively argue the deterrent effect of the death penalty (see *People* v. *Love* (1961) 56 Cal.2d 720, 731 [16 Cal.Rptr. 777, 366 P.2d 33]) but simply inquired about the matter during voir dire. We have found no cases suggesting that such voir dire inquiries, conducted for the purpose of determining a prospective juror's views regarding the death penalty, are improper.

### 4. *Statements Regarding Lingering Doubt*

Defendant points to inquiries made by the prosecutor on voir dire to some ultimate jurors regarding their willingness not to "worry about lingering doubt" of defendant's guilt once they concluded he was guilty beyond a reasonable doubt. Defendant did not object to the inquiries and, accordingly, the point was waived for appeal. In any event, no prejudicial misconduct occurred.

We have held that, in determining penalty, the jurors may consider any lingering doubts they may have concerning the defendant's guilt. (*People* v. *Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *People* v. *Kaurish* (1990) 52 Cal.3d 648, 706 [276 Cal.Rptr. 788, 802 P.2d 278].) On the other hand, the prosecutor is entitled to remind the penalty phase jury that it is not to redetermine guilt, which is to be presumed as a matter of law because the trier of fact had so found in the guilt phase. (*People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1239 [9 Cal.Rptr.2d 628, 831 P.2d 1210]. A defendant has no federal or state constitutional right to have the penalty phase jury instructed to consider any residual doubt about defendant's guilt. (*Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 173-174 [101 L.Ed.2d 155, 165-166, 108 S.Ct. 2320]; *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1252 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Cox, supra,* 53 Cal.3d at pp. 677-678.)

Although the prosecutor's inquiries may have improperly suggested to some ultimate jurors that any lingering doubt should be ignored, in the context of voir dire questioning it is unlikely these inquiries could have influenced the penalty verdict. Defendant does not claim, and the record does not indicate, that the prosecutor raised the subject of lingering doubt in his jury arguments at trial.

### 5. *Statement Regarding California's Death Penalty Law*

The prosecutor suggested to one ultimate juror that California was "a little different" from some other states in that special circumstances must be shown to justify a death sentence. Although defendant had earlier successfully objected to a similar statement (California was "a little unique"), defendant did not object to the present statement and, accordingly, the point was waived for appeal. In any event, no prejudicial misconduct occurred. The prosecutor's brief voir dire reference to California's supposedly "different" death penalty law could not possibly have affected the jury's ultimate verdict in this case.

### 6. *Statement Regarding Absence of Executions in California*

The prosecutor told one ultimate juror, without objection, that no one had been put to death in this state since 1965, and asked the juror whether imposition of the death penalty might "have any purpose whatsoever . . . ." Defendant suggests the statement was both inaccurate (the last execution had occurred in 1967) and improper (implying that death sentences are not carried out in this state).

Defendant's failure to object waived the point for appeal. In any event, no prejudicial misconduct occurred. The prosecutor's brief voir dire reference

to the fact that no one had been executed in California for some time, a matter of common knowledge among most persons, could not possibly have affected the ultimate verdict.

Defendant contends that, despite his counsel's failure to object to most of the foregoing asserted instances of misconduct, the court had a sua sponte obligation to "intervene" to protect defendant's due process rights. As we previously explained, no misconduct occurred here. In any event, a court has no obligation "to recognize and correct all possible or arguable misconduct on its own motion." (See *People* v. *Visciotti*, *supra*, 2 Cal.4th at p. 79.)

Defendant also argues that the foregoing asserted misconduct was so serious that an admonition to the jury would not have cured the harm. (See, e.g., *People* v. *Clair* (1992) 2 Cal.4th 629, 662 [7 Cal.Rptr.2d 564, 828 P.2d 705].) We disagree. The isolated instances of supposed misconduct occurred during voir dire "at a much less critical phase of the proceedings, before [the jury's] attention ha[d] even begun to focus upon the penalty issue confronting it." (*People* v. *Ghent*, *supra*, 43 Cal.3d at p. 770.) An admonition to the prospective jurors clearly could have substantially lessened any improper effect of such asserted misconduct.

Defendant suggests that his counsel's failure to object to the prosecutor's voir dire "misconduct" reflected his incompetence. As indicated, however, no serious misconduct occurred during any of these incidents and, accordingly, counsel's failures to object could not be deemed inadequate representation. Moreover, given the relatively minor nature of the supposed misconduct and its occurrence during voir dire rather than during or following trial, it is not reasonably probable that counsel's omissions affected the verdict. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052].)

C. *Prosecutor's Voir Dire Diagram*

 During voir dire examination of some ultimate jurors, the prosecutor used a diagram to help illustrate the quantum of proof he needed to prove defendant's guilt beyond a reasonable doubt. According to defendant, and the People do not claim otherwise, the diagram simply showed two horizontal lines, one labeled "100 percent certainty" and a second line beneath it labeled "beyond a reasonable doubt." The prosecutor then asked some ultimate jurors not to "hold" him to the 100 percent standard, but only to the "lower" standard. At one point, the prosecutor indicated that a conviction could be sustained if the juror can simply "cross this black line . . . in your head, of course . . . ." Defendant complained that the chart implied the

prosecutor's burden was only 50 percent certainty, but he made no formal objection to its use, thereby waiving any objection on appeal.

The chart was discarded following jury selection. Defendant maintains that the use of the chart, containing an erroneous description of the prosecutor's proof burden, constituted a denial of due process. Defendant argues the chart may have created the false impression that the jurors could use an "arbitrary" line in deciding whether the prosecutor had carried his burden of proof.

The courts, recognizing the difficulty and peril inherent in such a task, have discouraged "experiments" by trial courts in defining the "beyond a reasonable doubt" standard. (See *People* v. *Freeman*, *supra*, 8 Cal.4th 450, 503, 504.) By a parity of reasoning, similar perils undoubtedly would attend a prosecutor's attempt to reduce the concept of guilt beyond a reasonable doubt to a mere line on a graph or chart. But as we have previously observed, errors or misconduct occurring during jury voir dire, prior to the introduction of evidence or the giving of formal instructions, are far less likely to have prejudiced the defendant.

The jury in this case was given the standard instruction on the presumption of innocence, reasonable doubt, and the prosecutor's burden of proof. (CALJIC No. 2.90.) The language of the foregoing instruction was sufficient both to explain to the jury the prosecution's burden of proof and to dilute any confusion or uncertainty that may have been created by the prosecutor's voir dire chart. (See *Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239]; *People* v. *Freeman*, *supra*, 8 Cal.4th 450, 502-504; cf. *People* v. *DeSantis*, *supra*, 2 Cal.4th at p. 1243.) We find no prejudicial misconduct occurred here.

### D. *Restrictions on Voir Dire Questioning*

Defendant next contends the trial court improperly restricted his voir dire examination of prospective jurors regarding their views on the death penalty.

#### 1. *Questions Regarding Multiple Murder*

Although the court later changed its ruling and allowed such questioning, the court initially indicated it would disallow questions asking prospective jurors whether they could vote for life imprisonment if defendant committed multiple murders. According to defendant, this initial voir dire restriction inhibited his questioning of three ultimate jurors.

First, despite the court's eventual change of position, we doubt the court erred in initially restricting voir dire questioning. As we recently observed in

a similar case, involving a defense effort to determine whether the evidence of serious burn injuries suffered by the victims would cause a jury to automatically vote for the death penalty, "[i]t is true that counsel must be permitted to ask questions of prospective jurors that might lead to challenges for cause. [Citation.] The inquiry that defendant sought to make was not relevant to the death qualification process, however. . . . [V]oir dire seeks to determine only the views of the prospective jurors about capital punishment in the abstract, to determine if any, because of opposition to the death penalty, would 'vote *against* the death penalty without regard to the evidence produced at trial.' [Citations.] Such a juror may be excused because he or she would be unable to faithfully and impartially apply the law. The inquiry is directed to whether, without knowing the specifics of the case, the juror has an 'open mind' on the penalty determination. There was no error in ruling that questions related to the jurors' attitudes toward evidence that was to be introduced in this trial could not be asked during the sequestered . . . voir dire. [Fn. omitted.]

"The power of the judge to control the proceedings includes the exercise of discretion over the manner in which the voir dire will be conducted. [Citation.] No abuse of that discretion occurred here. Defendant was not precluded from attempting to show in the subsequent general voir dire that a juror harbored any specific bias that would cause him to vote for the death penalty without regard to mitigating evidence, and thus should be excused for cause. Since defendant did not do so, and did not exhaust his peremptory challenges, he is precluded from arguing on appeal that the jury was not properly constituted. [Citation.]" (*People* v. *Clark* (1990) 50 Cal.3d 583, 596-597 [268 Cal.Rptr. 399, 789 P.2d 127]; see *People* v. *DeSantis*, *supra*, 2 Cal.4th at pp. 1217-1218 [refusal to allow voir dire questioning about specific crimes that would cause prospective juror to automatically vote for death]; *People* v. *Rich* (1988) 45 Cal.3d 1036, 1105 [248 Cal.Rptr. 510, 755 P.2d 960] [voir dire not properly used to compel jurors to commit to vote particular way].)

Additionally, we find it unlikely the voir dire restriction at issue prejudiced defendant. Our review of the voir dire proceedings as to these three jurors indicates that each of them affirmatively agreed he or she would not automatically vote for death regardless of the evidence, and that they considered themselves "neutral" on the death penalty issue. Defense counsel had ample opportunity to question each of them regarding their ability to keep an open mind and base their penalty decision on the evidence in the case and on applicable sentencing factors. We note that after the trial court clarified its position with respect to the multiple murder question, defendant failed to ask to reexamine any juror on this topic.

### 2. *Other Voir Dire Restrictions*

■■■ Defendant also argues that the trial court erred in preventing him from asking prospective jurors to test their own impartiality by placing themselves in his position. The prosecutor successfully objected on the ground that such an inquiry or suggestion to the jurors would improperly tend to heighten sympathy for defendant.

Defendant contends that his inquiry was needed "to ascertain the prospective jurors' ability to render verdicts fairly and impartially in the case, according to law." Although defendant's tactic was arguably innocuous, the asserted restriction on voir dire questioning was likewise clearly harmless. There were ample alternative methods of ascertaining the jurors' ability to act fairly and impartially. No claim is made that the voir dire restriction actually impaired defendant's right to a fair and impartial jury. (See *People v. Edwards* (1991) 54 Cal.3d 787, 830 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

### E. *Prosecutor's Use of Peremptory Challenges*

Defendant contends the prosecutor improperly used peremptory challenges to remove jurors holding views opposed to the death penalty. Defendant waived the point by failing to object to these challenges. (See *People v. Gallego* (1990) 52 Cal.3d 115, 166 [276 Cal.Rptr. 679, 802 P.2d 169].) In any event, we have repeatedly rejected the argument. (E.g., *People v. Danielson, supra,* 3 Cal.4th at p. 714; *People v. Pinholster* (1992) 1 Cal.4th 865, 912 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People v. Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d 669].)

### F. *Trial Court's Jury Excusal Practices*

Defendant contends the trial court's policy of freely excusing prospective jurors who claimed financial hardship culled from the jury several classes of persons, including "wage earners, unemployed people, and self-employed people; in other words, anyone who could not afford to serve." According to defendant, the court's policy thereby denied him a fair and impartial jury. Again, the argument has been repeatedly and recently rejected. (E.g., *People v. Nicolaus* (1991) 54 Cal.3d 551, 571 [286 Cal.Rptr. 628, 817 P.2d 893]; *People v. Harris* (1989) 47 Cal.3d 1047, 1077-1078 [255 Cal.Rptr. 352, 767 P.2d 619].)

### G. *Evidence of Uncharged Crimes*

As previously indicated, the evidence of defendant's identity as the perpetrator of the charged offenses was in part based on evidence of a robbery

murder crime spree that included the uncharged Orange County murders of Ariza and Metal. The Ariza murder occurred within only a few hours of the charged offenses, and the Metal murder occurred a few weeks later.

Defendant contends the trial court erred in admitting evidence of these uncharged offenses. We disagree. The rules controlling our analysis are well settled: "Evidence of the defendant's commission of a crime other than one for which the defendant is then being tried is not admissible to show bad character or predisposition to criminality but it may be admitted to prove some material fact at issue, such as motive or identity. (Evid. Code, § 1101.) Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care. [Citation.]" (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1007 [254 Cal.Rptr. 586, 766 P.2d 1].) In cases in which the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense by evidence he had committed uncharged offenses, admissibility "depends upon proof that the charged and uncharged offenses share distinctive common marks sufficient to raise an inference of identity. [Citation.]" (*People* v. *Bigelow* (1984) 37 Cal.3d 731, 749 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723]; see also *People* v. *Ewoldt* (1994) 7 Cal.4th 380, 402-403 [27 Cal.Rptr.2d 646, 867 P.2d 757] [admissibility to show common plan or scheme]; *People* v. *Rivera* (1985) 41 Cal.3d 388, 392 [221 Cal.Rptr. 562, 710 P.2d 362].)

Although defendant disputes the sufficiency of the People's showing of distinctive common marks, we think there were enough common features or similarities to justify admission of the "other crimes" evidence. The charged and uncharged crimes each involved robbery murder of an employee working alone in a convenience store. The victims were each shot in the head, probably at close range, suggesting an execution murder. Ballistic reports indicate the *same* .22-caliber handgun, later traced to defendant, was used in all three murders. In both uncharged offenses, witnesses saw a battered green Maverick resembling defendant's car at the crime scenes shortly before or after the offenses took place. Each offense occurred within a two-and-one-half-week period; indeed, the charged offense occurred less than a day after the uncharged Ariza offense. Each offense was located along the route between defendant's sisters' homes, where he stayed during the time the various offenses were committed.

Defendant argues that, with the exception of the ballistics evidence, none of the foregoing "common marks," standing alone, is particularly distinctive. But we think that, in the aggregate, the similarities become more meaningful, leading to the reasonable inference that defendant was the person who committed all three crimes. Indeed, the ballistic evidence alone probably

would have been sufficient to justify admission of the "other crimes" evidence.

Defendant contends the trial court abused its discretion in failing to exclude the other crimes evidence as too prejudicial when weighed against its probative value. (Evid. Code, § 352.) Defendant suggests such evidence was "cumulative" to the prosecution's case. Our review of the record convinces us, however, that the trial court did not abuse its discretion in admitting the evidence as highly probative to the issue of defendant's guilt. As defendant acknowledges (in arguing against a finding of harmless error), the remaining evidence of defendant's guilt was limited to expert ballistics testimony, evidence that was "weak, if not completely insufficient, to prove that appellant robbed and murdered Craig Martin."

### H. *Bad Character Evidence*

The prosecutor established defendant's possession of the handgun and the green Maverick automobile through the testimony of several witnesses. According to defendant, much of this evidence was "not only cumulative, but implied that appellant had criminal or otherwise morally reprehensible tendencies." Defendant points to guilt phase testimony indicating that he had tattoos of a "Nazi swastika and the grim reaper," that he committed an uncharged rape and an armed robbery, and that he had stolen a gun from a pawnshop.

#### 1. *Defendant's Tattoos*

One of the witnesses who linked defendant to the gun and the Maverick was Karen B., who identified him from two photographs and also testified, over objection, regarding his tattoos. This testimony was corroborated by a detective who had also observed the tattoos. The trial court admitted the testimony, reasoning that it strengthened Karen B.'s credibility regarding her identification of defendant as the man she saw with the gun and the Maverick.

According to defendant, Karen's testimony was cumulative to other similar testimony linking defendant to the car and gun, and thus it was unnecessary to admit the tattoo evidence. But the weighing of probative, though possibly cumulative, evidence against its potentially prejudicial nature is a matter entrusted to the sound discretion of the trial court. (E.g., *People* v. *Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].) We find no abuse of that discretion here. Moreover, even if error occurred in admitting evidence of defendant's tattoos, the error was surely harmless in

light of the substantial "other crimes" evidence, properly admitted, confirming that defendant indeed had a criminal background. In light of such evidence, admission of evidence regarding defendant's tattoos could not possibly have prejudiced him.

### 2. *Rape of Karen B. at Gunpoint*

■ Defendant contends the court erred in permitting the prosecutor to question Karen B. regarding her encounter with defendant, during which he raped her at gunpoint. Our examination of the record discloses that, in accordance with the court's earlier ruling, the prosecutor and Karen carefully avoided mentioning the rape and limited her testimony to describing the gun and the Maverick she saw in defendant's possession, and the tattoos she saw on his back and stomach.

Defendant argues that the jury could "speculate" from Karen's "cryptic and very suggestive" testimony that defendant raped her. For example, she testified that she saw defendant with his shirt removed, and that at one point he was holding a gun which he placed on the night stand. But nothing in Karen's testimony suggested the commission of any sexual conduct, consensual or otherwise. Defendant points to Karen's additional testimony that the light in the room was turned off during most of the incident, but this testimony was elicited by defense counsel on cross-examination and, accordingly, any objection to it was waived.

### 3. *Evidence of Armed Robbery of Peter Yoon*

■ Defendant asserts the court erred in allowing the prosecutor to question Peter Yoon regarding his encounter with defendant, during which Yoon was robbed at gunpoint. The prosecutor and Yoon did not mention the robbery. Yoon simply testified on direct examination that he saw defendant carrying a gun, that he only noticed the tip of the barrel, that defendant entered a green Ford Maverick, and that Yoon wrote down the license number and gave it to police. Although defendant argues the testimony was cumulative and prejudicial, as we have explained such matters are entrusted to the sound discretion of the trial court. We find no abuse of that discretion here. Moreover, in light of the substantial "other crimes" evidence, properly admitted, including two other robbery/murders, evidence suggesting the defendant robbed Yoon at gunpoint could not possibly have prejudiced him.

### 4. *Gun Stolen From Pawnshop*

The prosecutor introduced evidence that defendant stole a .22-caliber handgun (probably the murder weapon) from a pawnshop. Defendant contends the court erred in failing to exclude references to the irrelevant fact

that the gun was stolen. Defendant failed, however, to object to such evidence at trial, and the point was accordingly waived for appeal. But, even if no waiver had occurred, evidence indicating that defendant stole a gun could hardly have prejudiced him in light of the "other crimes" evidence properly admitted, referred to above.

In sum, we conclude that no prejudicial error occurred in the admission of the foregoing "bad character" evidence.

### I. Evidence of Defendant's Prior 1961 Arrest

The prosecution linked defendant to the uncharged murder of Douglas Metal by matching a fingerprint found at the crime scene with one of defendant's prints on a 1961 fingerprint card taken at the Orange County jail. Defendant contends that this evidence of his 1961 arrest was unduly prejudicial because it suggested to the jury that he had long-standing "problems with the law." He observes that it was unnecessary to introduce the 1961 card because his current fingerprint card was available to match the crime scene fingerprint.

Defendant acknowledges that his trial counsel failed to object to the foregoing evidence, but he argues that his counsel's omission demonstrated his inadequacy. We have no reasonable basis for concluding, however, that counsel's failure to object to a 1961 jail fingerprint card, apparently taken when defendant was arrested on an unspecified criminal charge, was prejudicial to his case. (See *Strickland* v. *Washington, supra*, 466 U.S. 668, 688 [80 L.Ed.2d 693-694].) In light of the properly admitted evidence of defendant's crime spree, including two uncharged robbery murders, it is not reasonably probable the jury's verdict was influenced by the evidence at issue.

### J. Defendant's Postarrest Statement

Prior to trial, and without objection on *Miranda* grounds, the court ruled admissible defendant's postarrest statement to police after being read his *Miranda* rights. (See *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) After one of the officers indicated that he wanted to talk about the Riverside County murder, defendant asked, "What do you want me to say?" The officer replied that he only "wanted to talk about the truth." Whereupon defendant stated, "If I could only cry, but I can't cry. I couldn't even cry when my mother died." No further conversation took place.

At the pretrial hearing, the court ruled that the statement would be admissible because it "could be interpreted as an admission," and was

"inconsistent with a statement of innocence." At trial, the statement was admitted without objection. The court instructed the jury that an admission is a statement of the defendant tending to prove guilt when considered with the rest of the evidence, and that the jurors are the "exclusive judges" as to whether an admission was made. (See CALJIC No. 2.71.)

Defendant now argues the statement was irrelevant and unduly prejudicial, suggesting to the jury that he was a person incapable of human feelings or emotions. In defendant's words, the statement "did not prove or disprove any disputed fact in the case," but instead amounted to improper character evidence tending to show that he was "the kind of person who could commit murder."

Initially, defendant acknowledges that his counsel's failure to object to the admission of his statement at trial waived the point on appeal. (See *People* v. *Morris* (1991) 53 Cal.3d 152, 190 [279 Cal.Rptr. 720, 807 P.2d 949] [prior *in limine* motion, failing to specify legal ground now raised on appeal, insufficient to prevent waiver].) Defendant suggests, however, that his counsel's omission reflected his incompetence. We need not decide this issue, because in light of the ambiguous nature of the statement, it is not reasonably probable that counsel's failure to object to its admission adversely affected the verdict. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d 697-698].) The jury already knew from the "other crimes" evidence that defendant had committed other murders.

On the merits, we agree that the statement, being ambiguous and arguably nonresponsive to the officer's inquiry about the murder charges, had only marginal relevance. But the jury conceivably could have concluded that the statement reflected defendant's acknowledgment of his guilt and inability to feel remorse for what he had done. Thus, the trial court was justified in admitting the statement and leaving it to the jury to decide whether the statement was in fact an admission, and what weight to attribute to it.

Defendant also contends the record fails to show that, prior to making the statement at issue, he voluntarily waived his right to remain silent after being read his *Miranda* rights. But we cannot assume from a silent record that defendant, having heard a recital of these rights, nonetheless declined to waive them. An express statement of waiver is not required under such circumstances. (See *People* v. *Johnson* (1969) 70 Cal.2d 541, 556-558 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366].) Defendant also contends that the officers' failure to inform him of the possibility of a death sentence may have tainted the interrogation. We have rejected similar contentions. (*People* v. *Wash* (1993) 6 Cal.4th 215, 239 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

In any event, as previously indicated, even if the evidence were ruled inadmissible, any error in admitting it was clearly harmless in light of its marginal relevance to the guilt issues.

### K. *In-court Photographic Identification*

 Defendant next contends that he was denied due process by reason of an unduly suggestive photographic identification procedure at both the guilt and penalty phases of his trial. We limit our present discussion to the guilt phase.

As previously indicated, one of defendant's "other crimes" involved the robbery and murder of Horacio Ariza. Witness James Strong testified that he saw a green Maverick leaving the Arco station on the night Ariza was killed, and that he had a "glimpse" of the driver. Because defendant had been removed from the courtroom for his disruptive behavior, the court inquired whether defense counsel deemed it more prejudicial to have defendant identified by photograph or in person, dressed in prison clothes and wearing restraints. Counsel declined to choose and, without objection, the prosecutor showed Strong some photographs of defendant for identification purposes. Strong testified that defendant resembled the driver of the Maverick.

Defendant asserts the identification procedure was unduly suggestive and unreliable (see *Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967] [single person showup]; *People* v. *Gould* (1960) 54 Cal.2d 621, 631 [7 Cal.Rptr. 273, 354 P.2d 865] [still photograph identification]), but his failure to object waived the point (see, e.g., *People* v. *Ashmus* (1991) 54 Cal.3d 932, 972-973, fn. 10 [2 Cal.Rptr.2d 112, 820 P.2d 214]). Defendant's suggestion that his counsel was incompetent in failing to object overlooks a possible tactical motive for counsel's omission: counsel may well have concluded the photographic identification procedure was potentially less prejudicial to his client than having him present in court shackled and wearing prison clothes.

On the merits, although a one-person showup may pose a danger of suggestiveness, such showups "are not necessarily or inherently unfair. [Citations.] Rather, all the circumstances must be considered." (*People* v. *Clark*, *supra*, 3 Cal.4th at p. 136.) Here, as noted, the assertedly unreliable photographic identification procedure was necessitated by defendant's own disruptive conduct. Under these circumstances, we find no undue unfairness in that procedure.

### L. *Use of Life-size Mannequin*

 Defendant contends the court erred in permitting the prosecutor to use a life-size mannequin, with a wooden probe sticking through it, to

represent the trajectory of the bullet that killed Craig Martin. The manne-quin, along with most of the other exhibits, was present in the jury room during deliberations during both the guilt and penalty phases of trial. In defendant's view, the mannequin both lacked probative value and was "highly prejudicial." We disagree.

The mannequin was used by the prosecutor to demonstrate the likelihood that Martin was in a kneeling position when shot, i.e., that he was executed. Thus, the mannequin was relevant to show defendant's intent to kill, as well as his identity as the same person who executed victims Ariza and Metal. We have upheld similar use of mannequins in prior cases, including *Medina I, supra,* 51 Cal.3d at pages 898-899. (See also *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1291 [18 Cal.Rptr.2d 796, 850 P.2d 1] ["Mannequins may be used as illustrative evidence to assist the jury in understanding the testimony of witnesses or to clarify the circumstances of a crime."]; *People* v. *Brown* (1988) 46 Cal.3d 432, 442-443 [250 Cal.Rptr. 604, 758 P.2d 1135].)

As for potential prejudice, we find no basis for concluding the trial court abused its discretion in admitting the evidence and allowing its presence in the jury room. As we said in *Medina I, supra,* 51 Cal.3d at page 899, "[t]he trial court was in a far better position than we to assess the potential prejudice arising from the display of such physical evidence."

Moreover, defendant concedes that his trial counsel failed to object to the use of the mannequin or to its presence in the jury room. Accordingly, the point was waived for appeal. Contrary to defendant's assertion, such omis-sion was not so crucial to the defense case as to demonstrate trial counsel's incompetence.

M. *Admission of Autopsy Photograph*

 Defendant contends the court erred in allowing the prosecutor, over defense objection, to introduce at the guilt phase a single autopsy photograph of victim Martin. The photo showed the top of his head with most of the skin, skull and brain removed, and included a wooden probe, inserted through a hole in the head for purposes of demonstrating the trajectory of the bullet. The record indicates the court expressly ruled that the probative value of the photo outweighed its potential prejudicial effect. (See Evid. Code, § 352.)

Defendant contends the photo was "gruesome, inflammatory and unnec-essary." He observes that the evidence was cumulative, but we have often rejected the argument that photographs of the murder victim must be ex-cluded merely because they are cumulative to other evidence in the case.

*(People* v. *Wilson* (1992) 3 Cal.4th 926, 938 [13 Cal.Rptr.2d 259, 838 P.2d 1212] *(Wilson)*; *People* v. *Price, supra,* 1 Cal.4th at p. 441.) As for its gruesome nature, the trial court has broad discretion in weighing the probative value of such photos with their potential prejudicial effect. *(Wilson,* at p. 938.)

We have examined the photo in question, together with other similar photos of the victim admitted without objection, and we find no abuse of discretion here, and no basis for concluding that defense counsel's failure to object resulted in prejudice to defendant's case. Based on our review of the evidence, we believe the jurors were aware that the gruesome nature of the photo in question was more a result of routine autopsy procedures than a direct product of defendant's bullet.

Defendant suggests that the potential prejudicial effect of the photo could have been reduced without affecting its probative value by converting the photo from color to black and white. Defendant's failure to request such conversion at trial, however, waived the point for appeal.

## N. *Prosecutorial Misconduct During Closing Argument*

Defendant contends the prosecutor committed prejudicial misconduct during his guilt phase closing arguments. As will appear, we disagree.

### 1. *Griffin Error*

 Defendant first contends that the prosecutor improperly commented on his failure to testify. (See *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] *(Griffin).)* Under the rule in *Griffin,* error is committed whenever the prosecutor or the court comments, either directly or indirectly, upon defendant's failure to testify in his defense. It is well established, however, that the rule prohibiting comment on defendant's silence does not extend to comments on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses. (See *People* v. *Mayfield* (1993) 5 Cal.4th 142, 178-179 [19 Cal.Rptr.2d 836, 852 P.2d 331]; *People* v. *Morris* (1988) 46 Cal.3d 1, 35 [249 Cal.Rptr. 119, 756 P.2d 843], and cases cited.)

Here, the prosecutor, in his rebuttal argument, observed that the People had provided a "rational explanation" why defendant was seen with a handgun by several persons at the times of the various robberies (namely, that defendant was armed for the purpose of committing robberies on those occasions), and then asked rhetorically, "Where was Mr. Lewis' [defense

counsel] rational explanation? How does he explain away the evidence . . . .?"

Later in his argument, the prosecutor returned to this theme, urging that the jury should reject unreasonable interpretations of the evidence "even if [counsel] had given us one, which he didn't." Referring to the various witnesses who had seen defendant with a weapon and with the green Maverick automobile, the prosecutor observed, "[a]nd none of this evidence was explained. Nobody on the defense side—excuse me, the defense attorney did not explain this evidence and how it pointed to some other rational conclusion, because it doesn't, and he can't."

It is apparent to us that no prejudicial *Griffin* error occurred here. First, the prosecutor's comments were made without objection from defendant and, accordingly, the point was waived for appeal. (See, e.g., *People* v. *Johnson, supra*, 3 Cal.4th at p. 1228; *People* v. *Mincey* (1992) 2 Cal.4th 408, 446 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

Second, the prosecutor's comments were directed to the general failure of the defense to provide an innocent explanation as to why defendant was armed, and in possession of the Maverick, at the time of the robberies. These remarks contained no references, express or implied, to defendant's own silence, and therefore were unobjectionable. (See *People* v. *Vargas* (1973) 9 Cal.3d 470, 478-481 [108 Cal.Rptr. 15, 509 P.2d 959] [observing that most indirect *Griffin* error is harmless in any event].) It is not reasonably probable that the jury was misled into drawing an improper inference regarding defendant's silence. (See *People* v. *Clair, supra*, 2 Cal.4th at p. 663.) The prosecutor's remarks, viewed in context, can only be seen as a fair comment on the state of the evidence, comment falling outside the purview of *Griffin*. (See *People* v. *Mincey, supra*, 2 Cal.4th at p. 446.) It follows that, contrary to defendant's additional argument, defense counsel's failure to object was justifiable and cannot be deemed to constitute incompetent representation.

### 2. *Outside-the-record Comments and "Vouching"*

██ Defendant contends the prosecutor improperly included in his jury argument reference to matters outside the record, attempted to "vouch" for certain prosecution witnesses, and purported to rely on his own prior experience.

At one point in his argument, the prosecutor incorrectly indicated that victim Martin's father had previously testified his son had not known defendant. In fact, no such testimony had occurred, as defense counsel

observed in his own argument. At another point in his argument, the prosecutor stated that the People's ballistics experts, Slonina and Tulleners, appeared honest, were (as their testimony indicated) public employees, had no reason to lie, were not being paid for testifying, and told the truth to the jury.

Next, in attempting to minimize the impact of Karen B.'s prior felony conviction on her credibility, the prosecutor stated, "[s]he was being very honest with you. She has no reason to come in here. She was subpoenaed to come in and she testified. That felony conviction has nothing to do with her testimony in this case. It is something you should look at. *I wouldn't deceive you otherwise.* She told you she saw this gun and no other." (Italics added.)

Finally, at the end of his rebuttal argument, the prosecutor stated that "realistically, . . . *no case that I have ever seen* has this amount of overwhelming evidence pointing to the defendant's guilt." (Italics added.)

Because defendant made no objection to any of the foregoing remarks, he waived the right to complain of any misconduct on appeal. (E.g., *People v. Fierro, supra,* 1 Cal.4th at p. 211.) In any event, it is not reasonably probable the jury was influenced or misled by these relatively harmless remarks.

First, the jury could reasonably infer from the other evidence in the case that defendant, who engaged in a series of robbery murders involving convenience stores, did not personally know victim Martin. The prosecutor's apparent mischaracterization of Martin's father's testimony in this regard was harmless.

Second, the prosecutor's remarks regarding the testimony of the ballistics experts seem proper. Prosecutorial assurances, *based on the record,* regarding the apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper "vouching," which usually involves an attempt to bolster a witness by reference to facts *outside* the record. (E.g., *People v. Anderson* (1990) 52 Cal.3d 453, 479 [276 Cal.Rptr. 356, 801 P.2d 1107].) Here, the prosecutor properly relied on facts of record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief. (*Ibid.*; see *People v. Stansbury* (1993) 4 Cal.4th 1017, 1059 [17 Cal.Rptr.2d 174, 846 P.2d 756] ["The argument that Allen was a believable witness who had done a great deal of soul searching was a proper comment on the evidence, not an attempt on the part of the prosecutor to personally vouch for the witness's credibility."].)

As for the prosecutor's remarks regarding witness Karen B., they also fall into the category of legitimate comment on the evidence. Defendant emphasizes the prosecutor's personal assurance that he "would not deceive" the

jury. But this remark was probably merely linked to the prosecutor's concession that it was appropriate for the jury to consider the prior conviction. In any event, assuming misconduct occurred, it was undoubtedly harmless. (See *People* v. *Sully, supra,* 53 Cal.3d at p. 1236 ["The one personalized reference—a remark that the prosecutor had not deceived the jury and would not lie to it—was brief, innocuous, and followed immediately by references to evidence bearing on witness credibility. There was no conceivable prejudice to defendant in the remark."].)

As for the prosecutor's statement that "no case I have ever seen" had such overwhelming evidence, defendant correctly observes that prosecutors should not purport to rely on their outside experience or personal beliefs based on facts not in evidence when they argue to the jury. Indeed, the People herein have conceded the foregoing statement was "objectionable." (See *People* v. *Edelbacher, supra,* 47 Cal. 3d at p. 1030; *People* v. *Bandhauer* (1967) 66 Cal.2d 524, 529-530 [58 Cal.Rptr. 332, 426 P.2d 900] [reversible penalty phase error for prosecutor to repeatedly argue that during his many years of public practice he had seen some " 'pretty depraved character[s]' " and that defendant was the worst].) But, in light of the strong ballistic evidence linking defendant to the Martin offense, it is not likely the jury was unduly influenced by the prosecutor's claim. (See *People* v. *Stansbury, supra,* 4 Cal.4th at p. 1057 [holding "not inappropriate," prosecutor's statement " 'that's the best case I've ever seen in any case I've ever prosecuted of intentional misrepresentation and consciousness of guilt.' "]; *People* v. *Rich, supra,* 45 Cal.3d at p. 1092 ["fair" comment on the evidence where prosecutor argued " 'I have never seen deliberation and premeditation like that.' "].)

### 3. *Personal Comments About Defense Counsel*

██ Defendant suggests the prosecutor's argument improperly disparaged defense counsel and implied that counsel believed his client was guilty. Our review of the record, however, indicates both that defense counsel failed to object to the argument, and that the prosecutor's comments were proper.

On one occasion, the prosecutor merely argued that "[e]ven counsel would concede, *I would imagine,* that this was a first degree murder" (italics added), a speculative comment that defense counsel could have readily rebutted during his own argument. On another occasion, the prosecutor suggested that an incriminating inference could be drawn from the defense's failure to call a rebuttal witness, a fair comment on the evidence.

A third portion of the prosecutor's argument stressed that defense counsel's argument "conveniently" failed to contest certain elements of the

crime, and expressed some indignation over defense counsel's "patently offensive" remark that there were no eyewitnesses to the murder. Again, these were fair comments on the evidence.

The prosecutor also criticized defense counsel for suggesting to the jury that the law enforcement witnesses may be lying. ("They must all be lying, is basically what he told you. He didn't use the word 'lying.' That is what he is saying.") This too seems fair comment or argument on the inference to be drawn from defense counsel's earlier remarks to the jury that "All of these expert witnesses are from law enforcement agencies; and to say that they don't have an interest or a bias—I'm not saying that they would specifically come into court and lie because of a bias, but their thinking is going to be along the lines of prosecution and of conviction as opposed to defense."

Finally, defendant contends the prosecutor demeaned defense counsel's integrity by observing that "any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something . . . ." In our view, the prosecutor's foregoing argument was unobjectionable. To observe that an experienced defense counsel will attempt to "twist" and "poke" at the prosecution's case does not amount to a personal attack on counsel's integrity. (See *People* v. *Gionis* (1995) 9 Cal.4th 1196, 1214-1221 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; *People* v. *Espinoza* (1992) 3 Cal.4th 806, 819-821 [12 Cal.Rptr.2d 682, 838 P.2d 204]; *People* v. *Miller* (1990) 50 Cal.3d 954, 997 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People* v. *Bell* (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129].)

In any event, as previously indicated, defendant raised no objection to any of the prosecutor's foregoing remarks and, accordingly, the point was waived for appeal.

### 4. *Appeals to Passion or Prejudice*

The prosecutor, referring to the defense observation that no eyewitnesses had testified regarding the slaying of victim Martin, stated that if the law required an eyewitness in every case, almost all murderers who kill the witnesses "are going to go free." Subsequently, the prosecutor asked the jury to "do the right thing, to do justice, not for our society, necessarily or exclusively, but for Craig Martin, an 18 year-old boy who was just working at a gas station one night."

Defendant contends that the foregoing arguments improperly sought to appeal to the jury's passions and prejudices. (See *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1250-1251 [278 Cal.Rptr. 640, 805 P.2d 899]; *People* v.

*Fields* (1983) 35 Cal.3d 329, 362-363 [197 Cal.Rptr. 803, 673 P.2d 680].) Yet, as we concluded in the foregoing cases, we see no reasonable probability that the prosecutor's brief and isolated comments could have influenced the jury's guilt determination. Moreover, defense counsel failed to object or seek an admonition as to either remark, so any objection was waived for appeal.

### 5. *Misstatement of Law*

The prosecutor, summarizing some of the applicable law, told the jury that all murders, *whether of the first or second degree*, share three elements, namely, (1) a killing, (2) that was unlawful, (3) with intent to kill unlawfully. Then, the prosecutor stated that "[o]nce these elements are established in your mind, you must then determine whether or not it's a first degree murder or a second degree murder. Let me tell you . . . this is not a second degree murder. . . . [¶] *Second degree murder has none of the elements of first degree . . . murder.*" (Italics added.)

The prosecutor continued by explaining that the evidence in the case showed first degree murder, based on either a premeditation theory or a felony-murder theory. He did not return to the subject of second degree murder. Defendant now argues that the prosecutor's inconsistent argument misstated the law and probably confused the jury regarding the elements required for first and second degree murder.

Although it appears that the prosecutor misspoke, defendant waived the point by failing to object and request an admonition. Moreover, any error was harmless in light of the correct instructions on the subject of first and second degree murder that were given to the jury. The jury was told that it should apply the law stated in the instructions, and that if anything said by the attorneys conflicted with those instructions, the latter would control. Further, the jury was told that written copies of the instructions were available for its use during deliberations. The record is silent regarding any inquiry or confusion on the jury's part regarding the elements of first or second degree murder. Thus, we conclude it is not reasonably probable the jury was misled by the prosecutor's misstatement.

### 6. *Cumulative Effect of Prosecutor's Misconduct*

Defendant concludes by contending that although the prosecutor's various remarks, standing alone, may not disclose probable prejudice to defendant's case, in the aggregate these remarks should be deemed prejudicial. As we have seen, however, very few of the prosecutor's statements may

be characterized as misconduct, and those few improper or inaccurate statements were not serious enough, even in the aggregate, to have prejudiced defendant. Moreover, as we have indicated, defense counsel failed to object to any of the foregoing remarks or to request an admonition to the jury regarding any of them and, accordingly, he thereby waived his right to complain of them on appeal. And given the generally harmless nature of the statements at issue, counsel's failure to object resulted in no prejudice to defendant and thus cannot be deemed prejudicial incompetence.

### O. Sua Sponte Instruction on Shackling

As previously discussed in connection with a claim bearing on the competency phase of trial, defendant was shackled as a result of his past and present disruptive behavior. Defendant contends the trial court should have instructed the jury sua sponte to disregard his shackles in deciding the guilt and penalty issues. The court attempted to conceal the shackles from the jury by shrouding the front and sides of the counsel table, although the court indicated that it was likely that some jurors eventually would see the shackles.

As we previously explained in part II.C. (see *ante*, p. 732), "if the defendant's restraints have been viewed by the jury, the court ordinarily should instruct the jury not to consider the fact that restraints have been employed in determining defendant's guilt. (*People* v. *Duran, supra*, 16 Cal.3d at pp. 291-292.) But no sua sponte instruction is required if the restraints are not visible by the jury. (*People* v. *Livaditis*[, *supra*, 2 Cal.4th at p.] 775.) Moreover, failure to give such an instruction . . . may be deemed harmless if [as here] the omission is unaccompanied by other substantial errors and the guilt issue is not closely contested. (*Medina I, supra*, 51 Cal.3d at p. 898.)"

In the present case, given the cautionary measures taken by the trial court, it is doubtful that any jurors actually saw defendant in shackles for more than a few seconds. As we previously observed in part III.A. (*ante*, p. 735), by reason of his disruptive conduct, defendant was absent from most of the guilt phase and all of the penalty phase of his trial. Under such circumstances, a cautionary instruction could have called undue attention to the fact that defendant was a shackled, dangerous man. Accordingly, we find no error or abuse of discretion in failing to give such instruction sua sponte.

### P. Evidence of Consciousness of Guilt

Defendant contends that the court erred in instructing the jury that it could consider a pretrial statement by defendant as indicating his consciousness of guilt. As previously indicated, evidence disclosed that some

cash had been taken during the robbery murders of victims Ariza and Martin on October 18 and 19 respectively. Defendant's sister testified at trial that she saw defendant with a "roll" of bills, and that on October 23, defendant told her he had received some money from Phil Rocco. Rocco, however, testified that he had not given defendant any money.

Over defendant's objection, the trial court instructed the jury that if defendant made any willful misstatements "concerning the crimes for which he is now being tried, you may consider such . . . a statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and signifi- cance, if any, are matters for your determination." (See CALJIC No. 2.03.)

Defendant argues that his supposed "misstatement," if any, did not con- cern his "crimes," and accordingly the instruction should not have been given. The trial court disagreed, observing that, under the evidence, the jury reasonably could infer that the roll of bills seen in defendant's possession came from the robberies.

As in several prior cases, we find no error in giving the challenged instruction, which left it to the jury to decide whether any misleading statements were made, and if so, what weight should be given to the evidence. (See *People* v. *Breaux* (1991) 1 Cal.4th 281, 303-304 [3 Cal.Rptr.2d 81, 821 P.2d 585]; *People* v. *Ashmus, supra,* 54 Cal.3d at pp. 976-978; *People* v. *Morris, supra,* 53 Cal.3d 152, 215-216.)

We have likewise rejected defendant's related argument that CALJIC No. 2.03 is an improper argumentative pinpoint instruction (see *People* v. *Kelly, supra,* 1 Cal.4th at pp. 531-532), and we see no reason to reconsider that holding.

### Q. *Reasonable Doubt Instruction*

Defendant contends that the court used a "constitutionally flawed" defini- tion of reasonable doubt when it instructed the jury pursuant to CALJIC No. 2.90. The point lacks merit. (See *Victor* v. *Nebraska, supra,* 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239]; *People* v. *Freeman, supra,* 8 Cal.4th at pp. 501-505.)

### .R. *Instruction on Other Crimes Evidence*

Defendant contends the trial court erred in instructing the guilt phase jury that any uncharged crimes could be proved by a mere preponder- ance of the evidence, rather than beyond a reasonable doubt. As previously

indicated, the prosecutor was permitted to introduce evidence of two robbery murders, each committed under circumstances similar to the charged offense.

The court instructed the jury that the existence of defendant's "other crimes" could be proved "by a preponderance of the evidence." (See CALJIC No. 2.50.1.) In defendant's view, this instruction was erroneous and conflicted with the court's general instruction to the effect that facts established through circumstantial evidence and admitted to establish defendant's guilt must be proved beyond a reasonable doubt. (See CALJIC No. 2.01.)

First, we observe that defense counsel requested the instruction at issue and, accordingly, any error in giving it must be deemed invited error. (See *People* v. *Wader* (1993) 5 Cal.4th 610, 657-658 [20 Cal.Rptr.2d 788, 854 P.2d 80].) Although defendant asserts that requesting this instruction reflected his counsel's incompetence, we cannot determine on this record that counsel had no rational tactical purpose in doing so. (*Id.* at p. 658.) As we shall explain, the instruction was a standard one frequently given where "other crimes" evidence is elicited. Requesting an applicable standard instruction would seldom, if ever, be deemed inadequate representation.

On the merits, we have long held that "during the guilt trial evidence of other crimes may be proved by a preponderance of the evidence . . . ." (*People* v. *McClellan* (1969) 71 Cal.2d 793, 804 [80 Cal.Rptr. 31, 457 P.2d 871]; see *People* v. *Rosoto* (1962) 58 Cal.2d 304, 331 [23 Cal.Rptr. 779, 373 P.2d 867], and cases cited ["substantial proof" sufficient]; *People* v. *Lisenba* (1939) 14 Cal.2d 403, 429-430 [94 P.2d 569] [proof beyond reasonable doubt unnecessary]; cf. *Dowling* v. *United States* (1990) 493 U.S. 342, 348 [107 L.Ed.2d 708, 717-718, 110 S.Ct. 668] [" 'similar act' " evidence admissible in federal courts " 'if the jury can reasonably conclude that the act occurred and that the defendant was the actor' "].) The "beyond a reasonable doubt" standard is applicable only to evidence of "other crimes" sought to be admitted as aggravating evidence at the *penalty* phase of trial. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 54 [188 Cal.Rptr. 77, 655 P.2d 279].)

Prior cases explain that the facts tending to prove the defendant's other crimes for purposes of establishing his criminal knowledge or intent are deemed mere "evidentiary facts" that need not be proved beyond a reasonable doubt as long as the jury is convinced, beyond such doubt, of the truth of the "ultimate fact" of the defendant's knowledge or intent. (*People* v. *Lisenba, supra,* 14 Cal.2d at pp. 430-431, and cases cited.)

The courts have acknowledged that "other crimes" evidence may have a substantial impact on the jury's determination whether the defendant should

live or die. (*People* v. *Robertson, supra,* 33 Cal.3d at pp. 53-54.) Thus, at the penalty phase, it is appropriate to require proof beyond a reasonable doubt as to defendant's other crimes, given the high potential for prejudice. To require such exacting proof at the guilt phase, however, could convert the guilt phase into a series of collateral minitrials conducted whenever the People seek to rely on such evidence to assist in proving defendant's identity, intent or similar element of the charged offense. The risk of "sidetracking" the trial would be enormous.

Defendant argues that when "other crimes" evidence is offered to prove such matters as intent or identity, these facts should be proved by the "beyond reasonable doubt" standard usually applicable to facts sought to be proved by circumstantial evidence. But, as noted, the cases have developed special rules for the consideration of other crimes evidence. We see no compelling reason to reconsider those decisions here.

S. *Circumstantial Evidence Instruction*

In a related argument, defendant contends the standard circumstantial evidence instruction (CALJIC No. 2.01) undermined the constitutional requirement of proof beyond reasonable doubt. This instruction, in part, told the jury, at both the guilt and penalty phases, that (1) if circumstantial evidence is susceptible of two "reasonable" interpretations, the jury must accept the one pointing to defendant's innocence, and that (2) if one interpretation of such evidence "appears" to be reasonable and the other appears unreasonable, the jury must accept the reasonable one.

In defendant's view, it was improper to suggest to the jury that they could adopt an interpretation of potentially inculpatory circumstantial evidence merely because it "appeared" to be a reasonable one. According to defendant, the instruction improperly evaded the requirement of proof beyond reasonable doubt, and in effect called on the jury to make a "conclusive presumption" of defendant's guilt.

First, we observe that defense counsel requested the instruction at issue and, accordingly, any error in giving it must be deemed invited error. (*People* v. *Wader, supra,* 5 Cal.4th at pp. 657-658.) Although defendant asserts that requesting this instruction reflected his counsel's incompetence, we cannot determine on this record that counsel had no rational tactical purpose in doing so. (*Id.* at p. 658.)

On the merits, we have recently rejected an identical challenge to CALJIC No. 2.01. (See *People* v. *Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887], and cases cited.)

T. *Incompetence of Counsel: Double Jeopardy*

██ Defendant faults his trial counsel for failing to rely on a double jeopardy defense. As previously indicated, in earlier proceedings in Orange County, defendant was prosecuted for three counts of murder. During the penalty phase of that earlier trial, the prosecutor admitted evidence of the present murder of Craig Martin as aggravating evidence. (See § 190.3.) According to defendant, by reason of the Orange County proceedings, the present charges should have been dismissed on double jeopardy principles.

We have repeatedly held that the constitutional guarantee against double jeopardy "is inapplicable where evidence of prior criminal activity is introduced in a *subsequent* trial as an aggravating factor for consideration by a penalty phase jury. [Citations.]" (*People* v. *Garceau* (1993) 6 Cal.4th 140, 199-200 [24 Cal.Rptr.2d 664, 862 P.2d 664], italics added; see *People* v. *Visciotti, supra,* 2 Cal.4th at p. 71; *People* v. *Frank* (1990) 51 Cal.3d 718, 729 [274 Cal.Rptr. 372, 798 P.2d 1215]; *People* v. *Melton* (1988) 44 Cal.3d 713, 756, fn. 17 [244 Cal.Rptr. 867, 750 P.2d 741.) As defendant observes, here the reverse situation occurred: the evidence at issue was first introduced as an aggravating factor at the *prior* trial in Orange County. In defendant's view, double jeopardy should apply in cases in which the defendant has already once "defended" against the charges at the penalty phase of an earlier trial. We disagree.

In *People* v. *Visciotti, supra,* 2 Cal.4th at page 71, we reasoned that "[t]he presentation of evidence of past criminal conduct at a sentencing hearing does not place the defendant in jeopardy with respect to the past offenses. He is not on trial for the past offense, is not subject to conviction or punishment for the past offense, and may not claim either speedy trial or double jeopardy protection against introduction of such evidence. [Citation.]" (See also *Dowling* v. *United States, supra,* 493 U.S. 342, 348 [107 L.Ed.2d 708, 717-718]; *People* v. *Douglas* (1990) 50 Cal.3d 468, 528 [268 Cal.Rptr. 126, 788 P.2d 640]; *People* v. *Melton, supra,* 44 Cal.3d at pp. 754-755.)

We see no reason why the foregoing analysis should not apply here. Defendant was not placed in jeopardy when evidence of the present charges was introduced at his Orange County trial. Accordingly, defense counsel was not incompetent in failing to assert a double jeopardy objection at the trial of the present charges.

IV. PENALTY PHASE ISSUES

A. *Nonstatutory Aggravating Evidence*

Defendant contends the People were improperly permitted to introduce as aggravating evidence at the penalty phase some evidence not relating to the

statutory aggravating factors set forth in section 190.3. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782].) The claim lacks merit. As will appear, defendant failed to object to much of the evidence at issue and, accordingly, he thereby waived the objection on appeal. In any event, the evidence was either relevant to the penalty issue or of such a minor character as to render any error in its admission clearly harmless.

### 1. *Evidence of Defendant's Racial Hatred*

 Defendant points to guilt phase evidence, repeated at the penalty phase, that defendant had a swastika tattoo. This evidence was initially properly admitted to corroborate the "other crimes" testimony of witness Karen B., who testified she saw such a tattoo while defendant was engaged in raping her. (See *ante*, p. 750.) Karen also testified at the penalty phase, without objection, that defendant told her, during the sexual assault, "that he was part nigger, and that I was a nigger now because he was part nigger."

Defendant claims that the evidence of defendant's swastika tattoo and his use of the racial epithet while raping Karen B., together with other properly admitted evidence that defendant had attacked two Black men while in prison, combined to create the prejudicial impression that defendant was a racist. The claim seems dubious in light of defendant's statement to Karen that he was part Black. In any event, the foregoing evidence was either relevant on independent grounds (the tattoo) or admitted without objection (the racial slur), and the prosecutor made no attempt to use such evidence to paint defendant as a racist. Under the circumstances, the court did not err in admitting it.

### 2. *Evidence of Defendant's Violent Acts in Prison*

 Defendant contends that penalty phase evidence regarding his violent acts in prison improperly created the impression that prison officials could not control his conduct. He acknowledges that evidence of his violent conduct (assaults on several prison inmates, a prison barber, a correctional officer, and a doctor's assistant) was admissible under section 190.3, factor (b). But he contends that related testimony was improperly admitted.

Thus, in the course of testifying about defendant's prison assault on him, Officer Coates testified, over objection, that defendant was one of those inmates who were always placed in restraints when removed from their cells, and that Mace seemed to have no effect on him. Officer Sherwood, testifying regarding defendant's assault on another inmate, observed, *without objection,*

that defendant was housed in a maximum security facility, that Sherwood stayed away from the area where the fight broke out for his "own protection, knowing the physical capabilities of the individual," that another officer was unable to stop defendant's assault despite shooting him in the buttocks with a .38-caliber pistol, and that several officers were needed to subdue him.

According to defendant, the foregoing testimony improperly indicated to the jurors that he was essentially uncontrollable by prison personnel, an inference that could have induced the jury to impose the death penalty. Indeed, the prosecutor said as much during his closing argument. (E.g., "There is no controlling this person. There is no way to prevent him from having contact with other people . . . .") We find no prejudicial error.

First, defendant has waived the right to complain of any testimony or argument to which no objection was made. (*People* v. *Pinholster, supra*, 1 Cal.4th at pp. 960-961.) Second, on the merits, our cases have generally allowed the prosecutor to argue the defendant's future dangerousness in prison, based on the evidence in the case. (E.g., *People* v. *Danielson, supra*, 3 Cal.4th at pp. 720-721; *People* v. *Pinholster, supra*, 1 Cal.4th at p. 963; cf. *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767 [175 Cal.Rptr. 738, 631 P.2d 446] [holding inadmissible *expert* predictions that persons will commit future acts of violence].) Assuming arguendo that the court erred in allowing testimony regarding defendant's uncontrollability, any such error was harmless. Given the conceded admissibility of the array of evidence of defendant's prison assaults and numerous prior violent crimes, the additional evidence at issue, including defendant's seeming resistance to Mace or gunshot wounds, would have added little of substance to the jurors' impressions regarding his dangerousness.

As in *People* v. *Pinholster, supra*, 1 Cal.4th at pages 961-963, where similar evidence of prison incidents was admitted along with proper evidence of the defendant's prior violent activity, we conclude that "[i]n light of the circumstances of the charged crimes and the volume of evidence of prior criminal activity that was properly admitted, there can be no reasonable possibility that any improperly admitted evidence was prejudicial." (*Id.* at p. 963, fn. omitted.)

### 3. *Evidence of Attempted Escape*

The prosecutor presented evidence that defendant attempted to escape from an Arizona courtroom in 1977, that he struck, shoved, or violently collided with a probation officer in the course of doing so, and that he resisted rearrest by kicking and flailing his hands and fists at the officers

who subdued him. Defendant contends that, because there was "insufficient evidence" of a battery or other involvement of violence, the incident was inadmissible under section 190.3, factor (b). We disagree. There was ample evidence that defendant's attempted escape involved actual, or threatened use of violence. (See *People* v. *Mason* (1991) 52 Cal.3d 909, 954-956 [277 Cal.Rptr. 166, 802 P.2d 950]; *People* v. *Boyde* (1988) 46 Cal.3d 212, 250 [250 Cal.Rptr. 83, 758 P.2d 25].)

In any event, in light of the other properly admitted evidence of defendant's violent crimes, any error in admitting the escape evidence was clearly harmless. (See *People* v. *Danielson*, *supra*, 3 Cal.4th at p. 722; *People* v. *Pinholster*, *supra*, 1 Cal.4th at p. 963; *People* v. *Gallego*, *supra*, 52 Cal.3d at p. 196.)

### 4. *Evidence of Karen B.'s Fear of Defendant*

Prosecution witness Karen B. testified without objection that she delayed for a week reporting defendant's sexual assault because she was "afraid to go to the police." In defendant's view, that remark was probably viewed by the jury as indicating Karen's fear of defendant, an irrelevant factor at the penalty phase. But the remark was ambiguous. Although the trial court gave defense counsel the opportunity to clarify Karen's response, counsel declined to do so. In any event, the testimony was too minor, in comparison with the other aggravating evidence in the case, to have possibly prejudiced defendant.

### 5. *Evidence That Defendant Forfeited Bail and Falsely Claimed Rehabilitation*

The prosecutor introduced evidence on rebuttal showing that in 1977 defendant, while on bail and awaiting sentencing on a California felony charge, fled to Arizona in violation of his probation. The prosecutor also established that in March 1982, defendant, arrested on unrelated Arizona charges, wrote a letter to a California court claiming that his supposed rehabilitation justified either dismissing the California charges or imposing sentence for them concurrently with the Arizona charges.

Defendant contends that the foregoing evidence was irrelevant and potentially prejudicial, informing the jury that he was a "bail jumper" who made false claims of rehabilitation to obtain a less severe sentence. The evidence was not irrelevant, as it corroborated the evidence disclosing defendant's prior convictions. In any event, the testimony was too minor, in comparison with the other aggravating evidence in the case, to have possibly prejudiced defendant.

### 6. *Evidence of Defendant's Violent Dream*

██ Defendant's sister, Irene McIntosh, gave generally mitigating penalty phase evidence regarding defendant's family background and childhood. But on cross-examination she testified, without objection, that she began to fear defendant once he told her of a dream in which he viewed her naked back, which bore signs of scratches and blood. After defendant was arrested on the current charges, McIntosh told a detective about the dream and speculated that maybe she would have been defendant's "next victim."

As defendant observes, this dream evidence was probably irrelevant. A sister's "fear" of her brother is neither a proper aggravating factor, nor proper rebuttal to her mitigating "background" evidence. But the evidence, in the form of a dream, was also too speculative, obscure and nonfactual in nature to have possibly prejudiced defendant. Moreover, his failure to object waived the point for appeal.

### 7. *Evidence of Defendant's Arrests*

On direct examination, defendant's sister, McIntosh, indicated that defendant's conduct changed after he was released from San Quentin prison in the 1970's. On cross-examination, McIntosh acknowledged ("I guess so") that defendant "was arrested numerous times before 1968 for violent actions on his part." She also agreed that her brother "had a fairly extensive contact with the criminal justice system before he ever went to San Quentin."

Defendant now contends that the court erred in allowing McIntosh to confirm defendant's *arrests* rather than his convictions or commission of actual violent crimes. Defendant correctly observes that mere arrests are usually inadmissible, whether as proof of guilt or impeachment (see *People v. Anderson* (1978) 20 Cal.3d 647, 650-651 [143 Cal.Rptr. 883, 574 P.2d 1235]), or as aggravating penalty phase evidence (see *People v. Hamilton* (1963) 60 Cal.2d 105, 132 [32 Cal.Rptr. 4, 383 P.2d 412]).

The trial court had permitted the testimony on the theory that it tended to rebut McIntosh's direct testimony that defendant's violent acts commenced after he was released from prison. But evidence of mere "arrests" for violent conduct is not proper rebuttal evidence for this purpose. Nonetheless, the evidence at issue was clearly harmless in light of defendant's extensive criminal record.

### 8. *Evidence That Defendant Stole a Truck and Threatened His Father*

On cross-examination to rebut her testimony regarding defendant's loving relations with his family, the prosecutor elicited from witness McIntosh that

defendant's father asked him whether he had stolen a truck, and that defendant later told McIntosh he would "slap his [father's] face and kick the shit out of him" if he "says anything" about the incident. Defendant contends that the foregoing testimony was irrelevant, but we find it was proper cross-examination. In any event, the testimony was too minor to have resulted in prejudice. As previously indicated, the jury was well aware of defendant's violent tendencies.

### 9. Evidence That Defendant Stole a Gun

██ As previously discussed in part III.H.4. (see *ante*, p. 750), the prosecutor presented guilt phase evidence indicating that defendant stole a gun (probably the murder weapon) from a pawnshop. He now asserts such evidence was inadmissible and might have prejudiced him at the penalty phase. As we observed, however, defendant failed to object to such evidence at trial, and the point was accordingly waived for appeal. Even if no waiver had occurred, evidence indicating that defendant stole the gun was relevant background information regarding the circumstances of the charged offenses (see § 190.3, factor (a)) and could hardly have prejudiced him in light of the "other crimes" evidence properly admitted, referred to above.

### 10. Evidence of Defendant's "Grim Reaper" Tattoo

As previously noted in part III.H.1. (*ante*, p. 749), prosecution witnesses confirmed at the guilt phase that defendant had a tattoo displaying the "grim reaper." Although defendant contends such evidence was irrelevant and potentially prejudicial, the evidence was relevant to the identification issue. In any event, any error was clearly harmless in light of the substantial "other crimes" and "violent character" evidence properly admitted during the penalty phase.

### 11. Summary

We conclude that the admission of all of the foregoing aggravating evidence, whether viewed individually or in the aggregate, did not constitute prejudicial error. Accordingly, defendant's additional claim of incompetent representation by counsel in failing to object to such evidence must also fall.

### B. Erroneous Conflicting Instructions on Penalty Phase Evidence

██ Defendant contends that, apart from the asserted errors in admitting the foregoing assertedly irrelevant and potentially prejudicial evidence, the trial court also erred in instructing the jury as to how it should treat such evidence.

The court instructed the jury to consider, in determining penalty, "all" of the evidence received at any part of the trial. (See CALJIC No. 8.85.) The court also instructed that evidence of defendant's other crimes involving force or violence or the threat of violence could be considered. (*Id.*, No. 8.87.) The court did not, however attempt to list the "other crimes" the jury properly could consider, or to specify the irrelevant evidence which the jury should ignore.

Defendant contends that the instructions regarding the use of aggravating evidence were thus inconsistent or incomplete. But defendant failed to request any clarifying instructions on the subject (see *People* v. *Johnson, supra,* 6 Cal.4th at p. 52), and we have held that the court has no sua sponte duty to give them (see *People* v. *Pensinger, supra,* 52 Cal.3d at p. 1267).

### C. *Lack of Adequate Notice of Aggravating Evidence*

According to defendant, the prosecutor delayed until two court days before trial in notifying defendant of his intention to rely on defendant's three assaults committed while in jail or prison, and also delayed in such notification regarding defendant's escape attempt until the day the evidence was presented to the jury. (See § 190.3.) Although defense counsel objected to the delay as to the assault evidence, he did not request a continuance as to either the assaults or the escape.

Ordinarily, unless the untimely notice adversely affected earlier proceedings, the failure to seek a continuance precludes any showing of prejudice attributable to delay in giving notice of aggravating evidence. (*People* v. *Johnson, supra,* 6 Cal.4th at p. 51; *People* v. *Pinholster, supra,* 1 Cal.3d at pp. 957-958, and cases cited; see *People* v. *Walker* (1988) 47 Cal.3d 605, 637 [253 Cal.Rptr. 863, 765 P.2d 70].) Defendant suggests that the delayed notice concerning the escape attempt evidence was prejudicial because it came too late to permit him to explore on voir dire whether the jurors could remain impartial despite hearing such evidence.

As previously indicated, defendant did not object to the delayed notice regarding the escape evidence. His sole objection to such evidence was on separate grounds, namely, its supposedly nonviolent character. Accordingly, he waived the point for appeal. (See *People* v. *Johnson, supra,* 6 Cal.4th at p. 51; *People* v. *Cooper, supra,* 53 Cal.3d at p. 842.)

Defendant contends that defense counsel was incompetent in failing to request continuances to allow more time to prepare for trial. But we have no basis for concluding, on this record, that such omissions were inadvertent.

Counsel may have had tactical reasons for not seeking a delay of trial; indeed, counsel may not have needed additional time to prepare for trial. Moreover, in light of the additional aggravating evidence properly presented by the People, it is not reasonably probable that any omissions regarding notice were prejudicial. (See *People* v. *Wright* (1990) 52 Cal.3d 367, 423-424 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Turner* (1990) 50 Cal.3d 668, 709 [268 Cal.Rptr. 706, 789 P.2d 887].)

### D. *Evidence of Prior Crimes Barred by Statute of Limitations*

■ Defendant contends that the prosecutor was improperly permitted to introduce evidence of several of defendant's "other crimes" despite the fact that such crimes were "stale" and "remote," and prosecution for such crimes was barred by the applicable statute of limitations. Defendant failed to object to such evidence, however, and therefore waived the point on appeal.

In any event, neither remoteness nor the expiration of the statutory limitations period bars admission of a defendant's prior unadjudicated criminal activity for purposes of section 190.3, factor (b). (See *People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1161 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People* v. *Cummings*, *supra*, 4 Cal.4th 1233, 1339; *People* v. *Johnson*, *supra*, 3 Cal.4th at p. 1244; *People* v. *Heishman* (1988) 45 Cal.3d 147, 192 [246 Cal.Rptr. 673, 753 P.2d 629].)

As we stated in *Rodrigues*, "Contrary to defendant's assertions, the state has a legitimate interest in allowing a jury to weigh and consider a defendant's prior criminal conduct in determining the appropriate penalty, so long as reasonable steps are taken to assure a fair and impartial penalty trial. [Citation.] Remoteness of the offense affects the weight, not admissibility, of the offense. [Citation.]" (*People* v. *Rodrigues*, *supra*, 8 Cal.4th at p. 1161.) Similar reasoning would apply to use of assertedly "remote" prior convictions admitted under section 190.3, factor (c). (Cf. *People* v. *Raley* (1992) 2 Cal.4th 870, 910 [8 Cal.Rptr.2d 678, 830 P.2d 712].)

### E. *Incompetence of Counsel: Double Jeopardy*

As previously discussed in part III.T. (*ante*, p. 765), defendant faults his counsel for failing to raise a double jeopardy defense at the guilt phase. He repeats the same argument in relation to the penalty phase, claiming additionally that admission of "other crimes" evidence at the penalty phase was improper. Our foregoing analysis, rejecting the double jeopardy claim on the merits, applies here. As we stated in *People* v. *Visciotti*, *supra*, 2 Cal.4th at page 71, "[t]he presentation of evidence of past criminal conduct at a

sentencing hearing does not place the defendant in jeopardy with respect to the past offenses." (See also *People* v. *Garceau, supra,* 6 Cal.4th at pp. 199-200.)

### F. *Incompetent Counsel: Penalty Phase Evidence*

■ According to defendant, his counsel presented "an extremely abbreviated defense case in the penalty phase." As previously indicated, Irene McIntosh, one of defendant's sisters, testified regarding his childhood and family background. Additionally, defense counsel presented a closing argument that included references to a lingering doubt regarding defendant's guilt, to the finality and severity of a life-imprisonment-without-parole sentence, to defendant's sister's testimony regarding his family background, and to various aspects of the court's penalty phase instructions.

Defendant contends his counsel was ineffective in failing to present more mitigating evidence, or to explain to the jury why a death sentence was inappropriate in this case. He observes that the record suggests the availability of additional family members and expert witnesses who could have given mitigating testimony. For example, defendant asserts that "*it is likely* that [defendant's other sister, Sylvia Ayala] would have given mitigating testimony. . . . Furthermore, *it is likely* that appellant's father would have been willing to testify to try to persuade the jury in this case to spare his son's life." (Italics added.) Additionally, defendant's brother and third sister "*might well* have told the jury that they cared for appellant and would be hurt if he were executed." (Italics added.)

Similarly, defendant assumes that psychiatric testimony was available "to explain appellant's abnormal psychiatric condition to the jury." Defendant observes that similar psychiatric and other expert testimony was elicited at his competency trial (before a separate jury), and he speculates that such testimony remained available and could have been presented during the penalty phase.

On direct appeal, a claim of ineffective counsel cannot be established by mere speculation regarding the "likely" testimony of potentially available witnesses. (See, e.g., *People* v. *Jackson* (1980) 28 Cal.3d 264, 288-289, 293 [168 Cal.Rptr. 603, 618 P.2d 149].) We cannot assume from a silent record that particular witnesses were ready, willing and able to give mitigating testimony, nor can we speculate concerning the probable content or substance of such testimony.

At trial, defense counsel stated on the record his reasons for declining to call additional family members, namely, his fear that they would disclose on

cross-examination damaging information regarding defendant. Similarly, defense counsel set forth his reasons for not eliciting psychiatric or other expert evidence at the penalty phase: he believed such witnesses might give incriminating testimony on cross-examination to the effect that defendant was feigning incompetence, or had committed further acts of criminal violence. Additionally, counsel explained that he had no recent psychiatric reports to submit because defendant had refused to talk to any doctors during the past year.

On this record, and without a clearer picture of the available testimony or evidence, we have no practical basis for second-guessing counsel's tactical appraisal of the risks in presenting it. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 425-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Similarly, we find no basis for concluding on this record that counsel's closing argument was inadequate as a matter of law. (See *People* v. *Cudjo, supra,* 6 Cal.4th at pp. 634-635.)

Defendant also contends that trial counsel was ineffective in failing to request a "lingering doubt" instruction to support his closing argument. We disagree. As we recently observed in *People* v. *Rodrigues, supra,* 8 Cal.4th at page 1187, "[d]efendant clearly has no federal or state constitutional right to have the penalty phase jury instructed to consider any residual doubt about defendant's guilt. [Citations.]" Counsel herein may well have assumed that, in the absence of affirmative evidence suggesting the possibility that someone other than defendant committed the robberies, the court would have refused to give such instruction on request. (See *People* v. *Cox, supra,* 53 Cal.3d at p. 678, fn. 20; see also *People* v. *Fauber* (1992) 2 Cal.4th 792, 864 [9 Cal.Rptr.2d 24, 831 P.2d 249] [tactical reasons may exist for declining to rely on lingering doubt at penalty phase].)

We conclude that, on this record, none of trial counsel's foregoing omissions constitutes inadequate representation. Defendant further argues that, in the aggregate, counsel's various errors and omissions throughout the trial, during both the guilt and penalty phases, resulted in a "breakdown of the adversarial process." We have previously explained why, on the present record, none of these matters necessarily constituted incompetent representation. That conclusion remains unchanged when we examine counsel's acts and omissions in the aggregate.

Most of counsel's omissions involved failure to object to evidence, testimony, or argument. But as we previously observed, failure to object to evidence or argument seldom establishes counsel's incompetence. (*People* v. *Thomas* (1992) 2 Cal.4th 489, 531 [7 Cal.Rptr.2d 199, 828 P.2d 101]; *People*

v. *Ghent, supra,* 43 Cal.3d at p. 772.) We conclude that, on this record, there is no reasonable probability the guilt or penalty verdicts were affected by counsel's assertedly inadequate representation. (See *Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at pp. 697-698].)

### G. *Inflammatory Photographs*

██ Defendant contends that autopsy photographs of "other crime" victim Rea, depicting his naked body and the head wounds he suffered, were improperly admitted during the penalty phase. Defendant acknowledges that the photos were relevant to show the type of wound incurred by Rea and its similarity to the wounds suffered by victim Martin. Nevertheless, according to defendant, these photos were "gruesome, inflammatory and unnecessary." He also argues that the evidence was cumulative. We have examined the photos in question, and we find no abuse of discretion in admitting them.

As we explained in our discussion of a similar guilt phase contention (pt. III.M., *ante,* pp. 754-755), we have rejected the argument that photographs of murder victims must be excluded merely because they are cumulative to other evidence in the case. As for the inflammatory nature of the photos, we have repeatedly stated that "[t]he decision whether to admit photographs is within the sound discretion of the trial court and its ruling will not be disturbed, ' "unless the probative value of the photographs is clearly outweighed by their prejudicial effect." ' [Citations.] We have examined the photographs and conclude that although they are indeed gruesome, they are not so horrific or shocking that we can conclude the trial court abused its discretion in admitting them. The jury was, after all, very familiar with the facts of the crime." (*People* v. *Hardy* (1992) 2 Cal.4th 86, 199 [5 Cal.Rptr.2d 796, 825 P.2d 781]; see also *People* v. *Frank, supra,* 51 Cal.3d 718, 735.) As we recently stated: "At the penalty trial, the [victim photograph] evidence was also relevant to the issues of aggravation and penalty. It demonstrated graphically the circumstances of the crime and therefore was relevant to a determination of the appropriateness of the death penalty. [Citations.]" (*People* v. *Raley, supra,* 2 Cal.4th at p. 914.)

Defendant suggests the prejudicial effect of the photos could have been reduced without affecting their probative value by converting the photos from color to black and white. Defendant's failure to request such conversion at trial waived the point for appeal. (See *People* v. *Frank, supra,* 51 Cal.3d at p. 735.)

### H. *Prosecution Misconduct During Closing Argument*

Defendant contends the prosecutor committed various instances of misconduct during the penalty phase. As will appear, defendant failed to object

to the asserted misconduct and, accordingly, has waived the point on appeal. (See *People* v. *Clair*, *supra*, 2 Cal.4th at p. 685.) In any event, we find no prejudicial misconduct.

### 1. *Injecting Personal Beliefs*

Defendant asserts the prosecutor improperly injected his personal beliefs into his closing jury argument when he observed (without defense objection) that the jury had been "inundated . . . with just the sheer acts of violence that we have heard about. I mean, I cannot imagine anyone in our society being more violent and more dangerous."

As we previously observed (pt. III.N.2., *ante*, pp. 756-758), prosecutors should not purport to rely in jury argument on their outside experience or personal beliefs based on facts not in evidence. (See *People* v. *Edelbacher*, *supra*, 47 Cal. 3d at p. 1030; *People* v. *Bandhauer*, *supra*, 66 Cal.2d at pp. 529-530 (*Bandhauer*) [reversible penalty phase error for prosecutor to repeatedly argue, without defense objection, that during his many years of public practice he had seen some " 'pretty depraved character[s]' " and that defendant was the " 'worst' "].) Defendant contends the prosecutor's remarks herein were similar in substance to those condemned in *Bandhauer*. We disagree.

In the present case, unlike *Bandhauer*, the prosecutor did not purport to rely on his own personal experience, his "many, many years" as prosecutor, or any other facts outside the record. (See *Bandhauer*, *supra*, 66 Cal.2d at p. 529.) Instead, he merely alluded to *facts of record*, i.e., the abundant "other crimes" evidence properly admitted as aggravating penalty evidence, and expressed an opinion, *based on such evidence*, that he could not imagine a more dangerous or violent person than defendant. Under these circumstances, we find no misconduct. (See *People* v. *Hovey* (1988) 44 Cal.3d 543, 579 [244 Cal.Rptr. 121, 749 P.2d 776] [prosecutor's suggestion that defendant's crime was " 'worst possible' " crime one might commit was not based on any secret information known only to prosecutor but instead was "reasonably fair comment on the evidence"]; see also *People* v. *Ghent*, *supra*, 43 Cal.3d at p. 772 [prosecutor's remark during penalty argument that " 'I know what the appropriate penalty is for what [defendant] did,' " held not misconduct because not based on facts outside record].)

We also observe that defense counsel failed to object or seek an admonition regarding the prosecutor's comments, an omission that ordinarily would bar the claim on appeal. (See, e.g., *People* v. *Fierro*, *supra*, 1 Cal.4th at p. 211.) Defendant observes that in *Bandhauer*, *supra*, 66 Cal.2d at page 530,

we reversed the conviction despite the defendant's failure to object. But, unlike the present case, in *Bandhauer* we concluded that the prosecutor's objectionable statements were so pervasive that an objection or admonition could not have cured the harm. (*Ibid.*)

Moreover, in light of the overwhelming evidence of defendant's repeated violent conduct, it is not reasonably possible the jury was unduly influenced by the prosecutor's opinion regarding defendant's dangerousness.

### 2. Arguing Defendant's Future Dangerousness in Prison

In his closing argument at the penalty phase, the prosecutor asserted that defendant was a dangerous, uncontrollable person who could not behave in prison. In defendant's view, this argument was improper, extending beyond a mere reference to defendant's future dangerousness, and essentially telling the jury it must assume responsibility for the likely failure of the penal system to control defendant as a prisoner. (See *Tucker* v. *Kemp* (11th Cir. 1985) 762 F.2d 1496, 1508.) We disagree.

First, defendant waived the point by not objecting. Second, as we previously noted in part IV.A.2. (*ante*, p. 767), our cases have generally allowed the prosecutor to argue the defendant's future dangerousness in prison, based on the evidence in the case. (E.g., *People* v. *Danielson*, *supra*, 3 Cal.4th at pp. 720-721; *People* v. *Pinholster*, *supra*, 1 Cal.4th at p. 963.) Both of the foregoing cases found proper similar prosecutorial argument regarding the defendant's probable continued violent behavior while in prison. In the present case, the prosecutor's emphasis on the seeming inability of defendant's custodians to control him was a fair comment on the evidence and was relevant to the prosecutor's thesis that defendant would continue to represent a danger to others in prison.

### 3. Use of Inflammatory Rhetoric

During his penalty phase closing arguments, the prosecutor indicated that it was impossible to recreate "the terror, the violence" that occurred during defendant's crime spree, and asked the jury to try to imagine the terror that each victim must have felt while lying on the ground awaiting execution. The prosecutor also insisted that "[y]ou can't give this person life without possibility of parole. It is not fair. It is not justice to Craig Martin or any of the other individuals. It is not justice, and that is what you are here for."

Defendant contends that the foregoing remarks were unduly inflammatory. Again, however, no objection was raised, and no admonition sought. In

any event, the prosecutor's argument did not exceed the bounds of propriety. (See *People* v. *Haskett* (1982) 30 Cal.3d 841, 863-864 [180 Cal.Rptr. 640, 640 P.2d 776] [prosecutorial argument at penalty phase properly invited jurors to put themselves in victim's shoes and to imagine her suffering]; see also *People* v. *Morales* (1989) 48 Cal.3d 527, 571-572 [257 Cal.Rptr. 64, 770 P.2d 244]; *People* v. *Hovey, supra,* 44 Cal.3d at p. 576 [prosecutor's use of large portrait of child victim during penalty phase arguments]; *People* v. *Fields, supra,* 35 Cal.3d at p. 362, and fn. 14.)

### 4. *Derogatory Remark Regarding Defense Counsel*

■ The prosecutor, in his closing remarks, observed that defense counsel would have the last chance to argue, and he suggested, without objection, that *if* defense counsel raised any new arguments, then "that is another device of some sort." Although defendant contends that this remark was improper as impugning counsel's honesty (see *People* v. *Bain* (1971) 5 Cal.3d 839, 847 [97 Cal.Rptr. 684, 489 P.2d 564]), we disagree with that characterization (see *People* v. *Breaux, supra,* 1 Cal.4th 281, 305-306; *People* v. *Bell, supra,* 49 Cal.3d at p. 538). Additionally, the remark was far too mild to constitute improper misconduct. (See *People* v. *Ghent, supra,* 43 Cal.3d at p. 762.) In any event, the point was waived by failure to object.

We conclude that none of the prosecutor's various arguments, either separately or in the aggregate, constituted prejudicial misconduct. In any event, each claim of misconduct was waived by defendant's failure to object.

### I. *Jury's Consideration of Defendant's Other Crimes*

■ As previously indicated, at the guilt phase the prosecutor introduced evidence of defendant's robbery and murder of Ariza and Metal for purposes of establishing defendant's identity and intent in the present case. The jury was then instructed that such other crimes must be established by a preponderance of the evidence. At the penalty phase, the prosecutor introduced no further evidence regarding these other offenses but asked the jury to consider them as aggravating circumstances in deciding penalty. The court properly instructed the jury that it should not consider as aggravating circumstances any crimes unless they were proved beyond a reasonable doubt.

Defendant now contends the court erred in failing to further direct the jury, sua sponte, to set aside its earlier determination of defendant's guilt of these crimes, based only on a preponderance of evidence and, for purposes of deciding penalty, to consider anew whether defendant committed them

beyond a reasonable doubt. We disagree. The court instructed the jury that before it could consider "any" of defendant's other criminal acts as aggravating, it must "first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts. You may not consider any evidence of any other criminal acts as an aggravating circumstance." We think this instruction was clear and unambiguous. If defendant wanted a more elaborate explication, he should have requested one. (See *Medina I, supra*, 51 Cal.3d at p. 902, and cases cited.)

In any event, it is not reasonably possible the verdict was affected by the absence of a clarifying sua sponte instruction. Defense counsel, uncontradicted by the prosecutor, thoroughly covered the precise point in his closing argument.

J. *Instructional Error: Double Counting of Charged Offense and Special Circumstances*

■ The jury was instructed (see CALJIC No. 8.85) that in determining penalty, it should consider, among other factors, the circumstances of the present offense as well as any special circumstances found to be true. According to defendant, this instruction permitted the jury to count the facts surrounding the Martin murder "more than once in its sentencing equation." Defendant also suggests the instruction permitted the jury to double count the robbery and the burglary special circumstance findings even though they were based on a single criminal act. Although defendant did not request a clarifying instruction, he now asserts that the court had a sua sponte duty to prevent such double counting.

We have rejected similar contentions, based on our conclusion that (1) the jury is not apt to give undue weight to the facts underlying the present offenses merely because those facts also give rise to a special circumstance (see *People* v. *Proctor, supra*, 4 Cal.4th at p. 550; *People* v. *Ashmus, supra*, 54 Cal.3d at p. 997; *People* v. *Keenan* (1988) 46 Cal.3d 478, 520-521 [250 Cal.Rptr. 550, 758 P.2d 1081]), and (2) the jury is entitled to consider that defendant's conduct involved the commission of multiple felonies (see *People* v. *Melton, supra*, 44 Cal.3d at p. 767). Defendant does not claim the prosecutor urged the jury to double count the facts or special circumstances in this case. Moreover, the possibility of any prejudice arising from the instruction at issue is "remote." (*Id.* at pp. 768-769.)

K. *Instructional Error: Asking Jury to Reach a Just Verdict "Regardless of the Consequences"*

■ Following the guilt phase, the trial court properly instructed the jury that, in deciding guilt, it should reach "a just verdict, regardless of the

consequences." At the penalty phase, however, the jury was not admonished to disregard the foregoing instruction, which is inappropriate in deciding the penalty issue (see *People* v. *Keenan, supra,* 46 Cal.3d at p. 517). Defendant contends the omission was reversible error.

We have recently rejected this contention, relying in part on counsel's jury arguments that stressed the importance of its penalty decision. (*People* v. *Mayfield, supra,* 5 Cal.4th at p. 183 [no reasonable likelihood jury would conclude it should disregard consequences of its penalty decision]; see also *People* v. *Nicolaus, supra,* 54 Cal.3d at pp. 585-586.)

In the present case, the trial court instructed the jury that in deciding penalty, it was to weigh the various aggravating and mitigating factors and was free to assign "whatever moral or sympathetic value you deem appropriate" to these factors. (See *People* v. *Wrest, supra,* 3 Cal.4th at p. 1113 [prejudice from "disregard consequences" instruction minimized where court instructed jury it could consider its sympathy for defendant].) Moreover, our review of the closing arguments indicates that both defense counsel and the prosecutor emphasized the importance of the jury's penalty decision, the appropriateness of such considerations as sympathy and compassion for defendant, and the necessity to carefully weigh all the relevant factors before making that decision.

In sum, we find no error in failing to instruct the jury that it should consider the consequences of its penalty decision.

## L. *Instructional Error: Vagueness of Sentencing Factors*

Defendant contends the penalty phase instructions failed to channel the jury's sentencing discretion as required by the Eighth and Fourteenth Amendments. (*Stringer* v. *Black* (1992) 503 U.S. 222 [117 L.Ed.2d 367, 112 S.Ct. 1130].) Specifically, he complains that of the section 190.3 factors in aggravation, factor (a), the circumstances of the crime, factor (b), the existence of other "criminal activity," and factor (i), defendant's age, were unconstitutionally vague. In *Tuilaepa* v. *California* (1994) __ U.S. __-__ [129 L.Ed.2d 750, 761-763, 114 S.Ct. 2630, 2637-2638], the United States Supreme Court confirmed the validity of the foregoing sentencing factors. (See also *People* v. *Turner* (1994) 8 Cal.4th 137, 208 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People* v. *Fudge* (1994) 7 Cal.4th 1075, 1126-1127 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People* v. *Noguera* (1992) 4 Cal.4th 599, 648-649 [15 Cal.Rptr.2d 400, 842 P.2d 1160]; *People* v. *Tuilaepa, supra,* 4 Cal.4th 569, 594-595; *People* v. *Proctor, supra,* 4 Cal.4th at pp. 550-551; see also *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1096-1097 [25 Cal.Rptr.2d

867, 864 P.2d 40]; *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 478-479 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

Defendant also contends the sentencing instructions were unduly vague because they failed to identify which factors were aggravating and which mitigating, or to explain to the jury how to treat any inapplicable factors. Again, we have repeatedly and recently rejected this contention. (*People* v. *Turner*, *supra*, 8 Cal.4th at p. 207-209, and cases cited.)

M. *Instructional Error: Miscellaneous Contentions*

 In related arguments, defendant challenges as vague and misleading, or otherwise defective, various portions of the court's principal penalty phase sentencing instruction. (CALJIC No. 8.88.) That instruction provides, in part, that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

We have previously rejected substantially identical contentions regarding this instruction and we discern no reason on the present record to reconsider our conclusions. Nonetheless, we briefly review defendant's various contentions.

First, defendant asserts that the subjective word "substantial" was inadequate to instruct the jury that aggravating circumstances must *outweigh* mitigating ones. To the contrary, read as a whole the court's instruction was sufficient in this regard, for it specifically explained that a "weighing" of such factors was involved, and carefully defined the weighing process. (See, e.g., *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1194 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

Second, defendant contends that the court's instruction improperly permitted a death verdict where merely "warranted" rather than where "appropriate." We recently described the purported distinction as "spurious" (*People* v. *Breaux*, *supra*, 1 Cal.4th at p. 316), and we observe that the language in question derives from an instruction specifically approved by this court in *People* v. *Brown* (1985) 40 Cal.3d 512, 545, footnote 19 [220 Cal.Rptr. 637, 709 P.2d 440], for use by trial courts as a substitute for the "mandatory" language of the sentencing statute.

Third, defendant contends the court's sentencing instruction improperly failed to direct the jury to enter a verdict of life imprisonment without parole in the event mitigating circumstances outweighed aggravating ones. Again,

we recently rejected this argument, holding that such an admonishment was unnecessary in light of the express instruction that a death verdict could be entered only if aggravating circumstances outweighed mitigating ones. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131].)

Fourth, defendant complains that the sentencing instruction failed to advise the jury that it could choose life imprisonment without parole even if it also found that aggravating circumstances outweighed mitigating ones. But defendant was not entitled to such an instruction. (See *People* v. *Hendricks* (1988) 44 Cal.3d 635, 654-655 [244 Cal.Rptr. 181, 749 P.2d 836].)

Fifth, defendant contends that the court's sentencing instructions improperly failed to require a finding beyond a reasonable doubt that aggravating circumstances outweighed mitigating ones, and that the death penalty was appropriate. We have repeatedly rejected the argument. (See, e.g., *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118] and cases cited.)

Sixth, defendant contends that the court's sentencing instruction failed to explain which party had the burden of proving that death was an appropriate penalty. But the death penalty law does not provide for any allocation of the burden of proof. Instead, as the jury is expressly instructed, the penalty is to be determined by a weighing of the applicable sentencing factors. (See *People* v. *Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].)

Seventh, defendant contends that the sentencing instructions were inadequate in failing to require unanimous jury findings regarding the truth of the various aggravating circumstances, and to require a "statement of reasons" supporting a death verdict. Again, we have repeatedly rejected similar contentions. (E.g., *People* v. *Pride* (1992) 3 Cal.4th 195, 268-269 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People* v. *Hardy, supra*, 2 Cal.4th at p. 214.)

### N. *In-court Identification*

 Defendant next contends that he was denied due process by reason of an unduly suggestive photographic identification procedure at the penalty phases of his trial. (We previously discussed a similar claim applicable to the guilt phase of defendant's trial. See pt. III.K., *ante*, p. 753.)

In the course of introducing evidence regarding defendant's other crimes, the prosecutor called witness Guzman, who testified that defendant assaulted

her in a bar in 1975. Without defense objection, she identified defendant through several photographs of him, including one showing his swastika tattoo. Additionally, witnesses Schaeffer and Wilder testified regarding a fight instigated by defendant in a shoe store in 1974. These witnesses, likewise without objection, identified defendant through his photographs.

Defendant asserts the identification procedure was unduly suggestive and unreliable, but his failure to object waived the point. (See, e.g., *People* v. *Ashmus, supra,* 54 Cal.3d at pp. 972-973, fn. 10.) On the merits, as previously noted, the assertedly unreliable photographic identification procedure was necessitated by defendant's own disruptive conduct. Under these circumstances, we find no undue unfairness in that procedure.

### O. *Automatic Motion to Modify Verdict*

Defendant asserts the trial court relied on improper considerations in denying his application for modification of sentence. (See § 190.4.) Defendant contends the court had determined its ruling prior to hearing defendant's arguments and relied on "improper considerations" and "inaccurate recollection of the evidence" in denying the motion. These points lack merit.

#### 1. *Prejudging Case*

According to the record, following defendant's argument on the modification motion, the court indicated that it had already "begun work and had virtually written my entire comments" on the motion. The court indicated it had exercised its independent review of the matter, and then proceeded to read its written statement to the parties. Defendant argues that it was improper for the court to "prejudge" the matter in this fashion. (See *People* v. *Belmontes* (1988) 45 Cal.3d 744, 815-816 [248 Cal.Rptr. 126, 755 P.2d 310].)

We disagree. The practice of formulating tentative rulings in advance of argument and reducing those tentative rulings to writing is commonplace and unobjectionable. (See *People* v. *Hayes, supra,* 52 Cal.3d at pp. 644-645.) As we stated in *Hayes,* "To do so does not mean that the court is unalterably bound by the writing or that it will not amend or even discard the writing if counsel's arguments persuade the court that its tentative views were incorrect. Nothing in the record indicates that the trial court failed to give due consideration to defense counsel's argument at the hearing." (*Id.* at p. 645.)

In the present case, counsel's motion consisted of no more than submitting the matter to the court's discretion based on the penalty phase evidence and

his previous arguments to the jury. No further evidence or argument was presented. We conclude that no improper prejudgment occurred here.

### 2. *Consideration of Probation Report*

■ Defendant contends the court's remarks "strongly suggest" that the court, in deciding the modification motion, improperly considered a probation report containing additional aggravating evidence not before the jury. (See, e.g., *People v. Wader, supra,* 5 Cal.4th at p. 665.) The point is without merit.

First, defendant waived the point by not objecting. (See *People v. Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984].) In any event, the record shows that *after* the court ruled on the motion, but before formal sentencing, the court indicated that "I have read and considered the probation officer's report." The court made no mention of the report in its lengthy statement of reasons in denying the modification motion, and thus no basis exists for finding any impropriety. (See *People v. Lang* (1989) 49 Cal.3d 991, 1044 [264 Cal.Rptr. 386, 782 P.2d 627] [trial court "read and considered" presentence report containing inadmissible evidence]; *People v. Fudge, supra,* 7 Cal.4th at pp. 1127-1128.)

The present situation is quite different from that in *People v. Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892], wherein the trial court, in denying the automatic motion for modification of sentence, expressly stated it was *relying* on facts found in an inadmissible probation report.

### 3. *Reliance on Improper Evidence*

Defendant contends the court's statement of reasons indicated it had relied on evidence that was not relevant to statutory sentencing factors, including such matters as defendant's nonviolent escape attempt and his future dangerousness. As indicated previously (see pts. IV.A.3., *ante,* pp. 767, 768, and IV.H.2., *ante,* p. 777), these matters were indeed appropriate for the jury's consideration in deciding the penalty issue.

Defendant also asserts the trial court erred in stating that during defendant's attempted escape he "knock[ed] one individual over." According to defendant, the evidence was uncertain as to whether defendant pushed, shoved, or violently collided with the man as he tried to leave the courtroom. The point is clearly frivolous in light of the remaining aggravating evidence in the case, cited at length in the court's statement of reasons.

Finally, defendant contends the court misstated that the mitigating effect of defense witness McIntosh's testimony was impeached by evidence of

defendant's criminal acts prior to incarceration in San Quentin prison. Defendant doubts that sufficient proof of such prior crimes was admitted. Once again, the point is de minimis in light of the substantial aggravating evidence outlined in the court's statement of reasons.

## V. CONCLUSION

The judgment of death is affirmed in its entirety.

Kennard, J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.**—I concur in the judgment.

In *People* v. *Medina* (1990) 51 Cal.3d 870 [274 Cal.Rptr. 849, 799 P.2d 1282], I would have reversed the judgment. I was of the opinion that the determination by a jury therein that defendant was mentally competent could not stand without offense to the due process clause of the Fourteenth Amendment to the United States Constitution because the statutory scheme codified in section 1367 et seq. of the Penal Code was fundamentally flawed in its allocation to defendant of the burden to prove his own incompetence pursuant to subdivision (f) of section 1369. (*People* v. *Medina, supra,* 51 Cal.3d at pp. 913-914 (dis. opn. of Mosk, J.).)

In this cause, I cannot embrace the same disposition. To be sure, there is the same jury determination of mental competence under the same statutory scheme. But in *Medina* v. *California* (1992) 505 U.S. 437, 442-453 [120 L.Ed.2d 353, 361-362, 112 S.Ct. 2572], affirming *People* v. *Medina, supra,* 51 Cal.3d 870, a majority of the United States Supreme Court rejected my view that the allocation of the burden of proof violated due process. Under the compulsion of their authority—but not by the force of their reasoning—I yield.

In conclusion, because I find no reversible error or other defect, I join in affirmance.

Appellant's petition for a rehearing was denied January 24, 1996, and the opinion was modified to read as printed above.